**UNITED STATES of America, Plaintiff,**

v.

**WESTERN ELECTRIC COMPANY, INC., et al., Defendants.**

**Civ. A. No. 82–0192.**

United States District Court, District of Columbia.

June 22, 1988.

---

Barry Grossman, Chief, Nancy C. Garrison, Asst. Chief, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for Department of Justice.

John D. Zeglis, Jim G. Kilpatric, Francine J. Berry, Mark C. Rosenblum, Basking Ridge, N.J., Howard J. Trienens, David W. Carpenter, Chicago, Ill., Ben W. Heineman, Jr., Robert D. McLean, Sidley & Austin, Washington, D.C., for AT & T.

Joseph P. Markoski, Herbert E. Marks, Miriam J. Goldstein, Squire, Sanders & Dempsey, Washington, D.C., for ADAPSO.

Richard E. Wiley, Michael Yourshaw, Katherine M. Holden, Wiley, Rein & Fielding, Washington, D.C., for American Newspaper Publishers Ass'n; W. Terry Maguire, Claudia M. James, American Newspaper Publishers Ass'n, Washington, D.C., of counsel.

Thomas P. Hester, Alan N. Baker, Ameritech, Chicago, Ill., Alfred Winchell Whittaker, Kirkland & Ellis, Washington, D.C., for Ameritech.

R. Michael Senkowski, Jeffrey S. Linder, Wiley, Rein & Fielding, Washington, D.C., for Association of Telemessaging Services Intern., Inc.

James R. Young, John M. Goodman, John Thorne, Bell Atlantic Corp., Washington, D.C., for Bell Atlantic; Robert A. Levetown, Mark J. Mathis, of counsel.

Walter H. Alford, Executive Vice President and Gen. Counsel, Mark D. Hallenbeck, Gen. Atty., Michael J. Schwarz, Francis B. Semmes, Atlanta, Ga., for Bell South Corp.; Abbott B. Lipsky, Jr., King & Spalding, Washington, D.C., of counsel.

Randolph J. May, Timothy J. Cooney, Jonathan E. Canis, Bishop, Cook, Purcell & Reynolds, Washington, D.C., for CompuServe Inc.

Norman P. Leventhal, David E. Horowitz, Leventhal, Senter & Lerman, Washington, D.C., for Digital Directory Assistance, Inc.

Sue D. Blumenfled, John L. McGrew, Willkie, Farr & Gallagher, Washington, D.C., for The Electronic Yellow Pages and Information Ass'n.

Gregory John Krasovsky, Associate Gen. Counsel, Florida Public Service Com'n, Tallahassee, Fla., for Florida Public Service Com'n.

Alexander P. Humphrey, Frank W. Krogh, General Electric Communications and Services, Washington, D.C., for General Electric Communications and Services.

Richard E. Wiley, Robert J. Butler, Wiley, Rein & Fielding, Washington, D.C., for Information Industry Ass'n.

Chester T. Kamin, Michael H. Salsbury, Anthony C. Epstein, Glenn B. Manishin, Carl S. Nadler, Jenner & Block, Washington, D.C., for MCI.

F. Sherwood Lewis, Washington, D.C., for MessagePhone, Inc.

Samuel A. Simon, Verner, Liipfert, Bernhard, McPherson & Hand, Washington, D.C., for National Consumers League, et al.; Thomas J. Keller, David M. Katinsky, of counsel.

Saul Fisher, Mary McDermott, NYNEX Corp., White Plains, N.Y. (Raymond F. Burke, of counsel), Martin J. Silverman, Washington, D.C., for NYNEX Corp.

Richard W. Odgers, Randall E. Cape, Kathy A. Hackmann, Pacific Telesis Group, San Francisco, Cal., Stanley J. Moore, Pacific Telesis Group, Washington, D.C., for Pacific Telesis Group.

Eric L. Chase, Margolis, Chase, Kosicki, Aboyoun & Hartman, Verona, N.J., for Phone Programs, Inc.

Liam S. Coonan, Southwestern Bell Corp., Washington, D.C., Edgar Mayfield, James S. Golden, William R. Drexel, Southwestern Bell Corp., St. Louis, Mo., for Southwestern Bell Corp.

David I. Shapiro, Richard C. Schramm, Geoffrey Bestor, Dickstein, Shapiro & Morin, Washington, D.C., for U.S. West, Inc.; Lawrence W. DeMuth, Jr., Stuart S. Gunckel, David S. Sather, of counsel.

## MEMORANDUM AND ORDER

HAROLD H. GREENE, District Judge.

On March 7, 1988, the Court detailed the manner and extent to which the Regional Companies are to be allowed to engage in the provision of information services under the terms of the consent decree. *United States v. Western Electric Co.*, C.A. No. 82–0192, slip op. (D.D.C. March 7, 1988) (hereinafter *Opinion*) [available on WEST-LAW, 1988 WL 34937]. Currently before the Court are motions to amend judgment pursuant to Federal Rule of Civil Procedure 59(e)[1] and for clarification[2] of that ruling.

Rule 59(e) of the Federal Rules of Civil Procedure is designed to allow courts to correct errors of fact appearing on the face of the record or errors of law, but the movant "must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986). A Rule 59(e) motion cannot be used as a vehicle to relitigate matters already argued and disposed of. *See Windsor v. A Federal Executive Agency*, 614 F.Supp. 1255, 1264 (M.D.Tenn.1983), *aff'd*, 767 F.2d 923 (6th Cir.1985). In the Court's view, none of the motions before the Court meets this standard, or for that matter any applicable standard,[3] and they will all therefore be denied.

### I

Limited intervenor Phone Programs Inc. (PPI) moves for reconsideration of the Court's ruling regarding revenue sharing, arguing that "by their nature, the [Regional Companies'] revenue sharing arrangements are anticompetitive and discriminatory." PPI Memorandum at 2. PPI concedes that its contentions have been squarely before the Court since its initial comments were filed in March 1987, *id.* at 8, but contends that the Court must have overlooked those filings when reaching a decision on the revenue sharing question. PPI's position on revenue sharing is no secret to this Court.[4] The Court did not, as PPI suggests, overlook PPI's previous filings, but rather found that, in the context of the totality of the information before the Court, its position was not relevant to the issues and not persuasive.[5]

At any rate, PPI's argument misconstrues the substance of the Court's ruling. The Court did not grant a blanket endorsement of "976"–like revenue sharing proposals; it merely noted that the kiosk billing system, as employed by Teletel, "is in many ways comparable to billing arrangements currently used by the Regional Companies for '976' services." Nor did the Court rescind its earlier prohibition against

---

1. Motion of Phone Programs, Inc. (PPI), March 14, 1988; Motion of Digital Directory Assistance, Inc. (DDA), March 17, 1988; Motion of CompuServe Incorporated, March 21, 1988.

2. Motion of the Florida Public Service Commission (FPSC), April 5, 1988. *See also* MCI's response to CompuServe's Motion.

3. PPI and CompuServe phrase their motions as being, in the alternative, under Rule 60(b) and/or Rule 52(b). The Court will not separately analyze the merits of their requests under each of these procedural provisions, but rather finds that the result would be the same regardless of the rule pursuant to which they are presented.

4. In the course of these proceedings, PPI has filed 24 pages of comments and 84 pages of exhibits on March 13, 1987; eight pages on April 2, 1987; six pages on May 20, 1987, and five pages on November 11, 1987. The Court considered the positions espoused therein in reaching its conclusions.

5. At this point, it is impossible to ascertain with certainty the degree of consideration accorded PPI's position prior to the March 1988 decision. However, the precise extent to which it was considered then is irrelevant for two reasons. First, the Court has now revisited the question, examining PPI's contentions in great detail. That review has uncovered no information which would warrant modification of the prior ruling. Second, PPI's submissions only go to the point that certain types of revenue sharing, as currently practiced by various Regional Companies, may be anticompetitive. There is no evidence that kiosk billing would necessarily implicate these same concerns, nor that the Regional Companies will arrange billing services in a manner that is discriminatory. PPI's filings therefore have no bearing on the Court's determination that kiosk billing will not be per se prohibited.

.arrangements that provide for the sharing of revenue. *See United States v. Western Electric Co.*, 673 F.Supp. 525, 594 (D.D.C. 1987). The only ruling entered by the Court in regard to billing arrangements is that kiosk-type billing arrangements would not be considered to "necessarily involve harmful revenue sharing agreements" and thus to be per se prohibited. *Opinion* at 45–46.

■ As the Court has previously stated, the Regional Companies will be allowed to bill on any basis, provided that the billing method is not discriminatory in any way. *Opinion* at 46. However, the Court did not, and does not intend to, rule on the merits of a hypothetically possible billing arrangement; such a ruling would be premature and in contravention of the judicial policy against deciding controversies not presented in a concrete factual setting. Should a Regional Company embrace a billing system appearing to be discriminatory, enforcement proceedings may be initiated and, if necessary, sanctions imposed. *See Opinion* at 51, n. 69 and accompanying text.

## II

CompuServe Incorporated, also a limited intervenor in these proceedings, moves pursuant to Rule 59(e) to amend the Court's ruling on the Regional Companies' ability to provide unrestricted storage capability for databases created by others and to provide electronic mail service.

■ First, as to Regional Company ability to provide unrestricted storage capacity, CompuServe complains that this aspect of the Opinion "constitutes a substantial departure from the concept of a 'gateway' infrastructure enunciated in the September 10 Opinion," CompuServe Memorandum at 6, presumably because storage capacity was not specifically identified therein as one of the five gateway functions per-

formed by the French system. However, the Court's failure to list, in its preliminary ruling, storage capacity as a potential gateway service is immaterial to the issue at hand. After reviewing the submissions of countless commentors, and specifically considering the objection that "these are not functions 'necessary' to a gateway," *Opinion* at 58–61, the Court made a determination in compliance with section VIII(C) of the consent decree that there is no significant potential for discriminatory behavior in the market for database storage. *Id.* at 55–56. It was on that basis that Regional Company participation in the data storage market was approved.

■ More substantively, CompuServe argues that the Regional Companies should be prohibited from providing storage because database owners seeking storage generally ask the storage provider also to perform functions that in CompuServe's view involve the manipulation and creation of content. CompuServe Memorandum at 9. CompuServe apparently believes this to be so because of the role it plays as a systems operator and the services it offers to owners purchasing storage space. *Id.* However, the mere fact that CompuServe, an unregulated information services provider, engages in content manipulation in conjunction with storage, proves very little. The Regional Companies remain bound by the Court's ban against engaging in activities which involve the manipulation or generation of content. *See Opinion* at 2 & n. 93. This ban extends to their activities performed as storage providers, a fact acknowledged by the Regional Companies in their responses to CompuServe's Motion.[6]

Second, as to the Court's ruling permitting the Regional Companies to provide electronic mail services, CompuServe argues (a) that the March 7, 1988 Opinion is internally inconsistent,[7] and (b) that the

---

6. *See, e.g.,* US West Opposition, April 4, 1988 at 3; BellSouth Opposition, April 4, 1988 at 10; NYNEX Response, April 4, 1988 at 4.

7. On the issue of alleged inconsistency, CompuServe notes that the Court stated in its Opinion (at 29) that "electronic mail ... should remain

prohibited ... under any general restriction on content." However, a footnote to that statement referring to "general" restrictions alerts the reader that electronic mail was being exempt on the basis of a more specific consideration.

Court failed to undertake a proper evaluation of the electronic mail market. Whatever the stated grounds for the motion, a close reading reveals that, as several parties have pointed out, it represents nothing more than the post-judgment plea of a disappointed party seeking reconsideration of its basic case.

■ The Court has held that, while electronic mail may technically and incidentally involve the manipulation of content, the nature of that manipulation is such that for practical purposes the stored information reaches the intended recipient in the same content form as it was in when it was delivered. *Opinion* at 57 n. 84. Having considered the electronic mail market[8] as well as the specifics of electronic mail services, as described in filings before the Court,[9] the Court continues to be of the view that this was a correct analysis. Accordingly, Regional Company provision of electronic mail services was and is approved as an exception to the general ban on the prohibition of their involvement in activities implicating content manipulation. *Id.* at 65.

### III

Digital Directory Assistance, Inc. seeks an amendment of the Court's ruling to clarify the scope of new section VIII(K)(3) of the consent decree[10] and the general nondiscrimination requirements referenced throughout the Opinion. DDA urges the Court to "state explicitly that discrimination [against competing 'White Pages' providers] is prohibited," DDA Motion at 5, and to identify more specifically the Regional Companies' obligations to competing information services providers, "particularly with respect to those types of permissible electronic 'White Pages' directory services which have a potential for competition." DDA Motion at 5–6.

The Court has stated again and again that the Regional Companies may not discriminate against their competitors, and that is still a basic requirement of the decree. As for the strenuous advocacy by various intervenors of the imposition of detailed procedural safeguards on the Regional Companies as a mechanism for preventing anticompetitive behavior, the Court has declined to adopt such an approach. *See Opinion* at 47–51. Indeed, the failure to outline specific procedural obligations with respect to "White Pages" was not an oversight, but rather a conscious determination made on the basis of the overall record. No new reason has been advanced why the Court should at this juncture revisit the question, particularly as it has previously considered and rejected the substantive arguments presented by DDA's Motion.

### IV

The Florida Public Service Commission requests clarification as to the nature of protocol conversion services approved by the Court, finding an incongruity between statements made on the subject in the Court's September 10, 1987 and March 7, 1988 Opinions. Although no other party or intervenor has noted any ambiguity,[11] the Court will reiterate its position on the matter.

■ The goal of a workable gateway, and consequently, effective protocol conversion, is to allow ready communication among the broadest and most disparate array of computer terminals. *Opinion* at 46. Protocol conversion will in many in-

---

8. *See id.* at 59 n. 87. The markets for voice storage for electronic mail have been converging and are likely to converge more rapidly in the future.

9. Included among the extensive filings before the Court relating to voice storage and retrieval services—including electronic mail—were various comments from CompuServe. *See, e.g.,* CompuServe Memorandum, October 15, 1987 at 8–10; CompuServe Response, November 16, 1987 at 8–12; CompuServe Reply, November 30, 1987 at 7. Those comments largely mirror the arguments advanced in the present motion.

10. *See Opinion* at 65–66 & n. 67.

11. Only three parties filed comments to the FPSC Motion; each comment opposes the motion and argues that no ambiguity exists. *See* BellSouth Opposition, April 18, 1988; PacTel Opposition, April 18, 1988; NYNEX Opposition, April 19, 1988.

stances necessarily involve a limited level of modification to the format of the message to be delivered via the network. To the extent that the alteration of the message is limited to the conversion of the signal used for transmission from that used by the sender to one comprehensible to the receiver, no "content manipulation" will be deemed to have occurred. The Court has also ratified forms of protocol conversion in which changes in message format are not apparent to system users.[12] Any form of protocol conversion which exceeds the scope of this transparency-oriented definition will of course continue to be prohibited.

## V

Although not filed as a motion, MCI has asked the Court to clarify that the information services Regional Companies may offer must be strictly intra-LATA. *See* MCI Response to CompuServe Motion, April 20, 1988.

Clearly, the Court did not modify the interexchange prohibition of the decree when it allowed Regional Company participation in the transmission of information services. To the contrary, in the very Opinion announcing the removal of the decree restriction on transmission of information services, the Court held that "[t]here is no basis under the decree for the removal of any of the restrictions on interexchange services." *United States v. Western Elec-*

*tric Co.*, 673 F.Supp. 525, 552 (D.D.C.1987). While there does not appear to be any confusion on this point, either by the Regional Companies [13] or by competing interexchange carriers,[14] MCI seeks to obtain a ruling on the parameters of Regional Company ability to serve subscribers in one LATA from central locations in another LATA.

The impetus for this request was apparently provided by statements made by Bell Atlantic and U S West that placing a gateway facility in each LATA would create inefficiencies, particularly for those Regional Companies serving vast and largely rural territory. US West Answer at 1–2; Bell Atlantic Response at 3. These Regional Companies have accordingly proposed serving subscribers in one LATA from a gateway established in another LATA, placing only a packet assembler/dissembler (PAD) [15] at the local switching facility. This arrangement, they argue, does not involve provision of interexchange services, but rather entails inter-computer communications allowing the PAD to acquire the initial menu, help functions and routing information from a centralized location.[16] US West Reply at 3. The Regional Companies guarantee that, once the PAD determines the instructions necessary to connect the subscriber with the Information Services Provider (ISP) he wishes to reach, any interexchange portion of the connection be-

---

**12.** For example, conversion of message content to digital form for storage, and then return to analog form for retrieval and transmission does not constitute impermissible "content manipulation." *Opinion* at n. 84.

**13.** *See* US West answer to MCI, May 4, 1988 at 1; Bell Atlantic Response to MCI, May 13, 1988 at 1–2. The remaining Regional Companies did not file comments to MCI's submission.

**14.** The sole comment received on this question from an interexchange carrier was that filed by MCI.

**15.** A PAD is necessary to convert asynchronous signals to the packet-switched network. MCI Response to BOC Proposals, May 19, 1988 at 9 n. 23. US West apparently contemplates placing a PAD within each LATA, which would communicate with a central facility, not necessarily within that same LATA, wherein the gate-

way functions are stored. US West Reply to MCI, June 1, 1988 at 1–3.

**16.** The Regional Companies seek to analogize the interaction of the PAD with the centralized network functions to the architecture the Court has permitted for directory assistance and operator services, and for remote call processing where the call is brought back to the originating LATA for completion or hand off to an interexchange carrier. *See United States v. Western Electric Co.*, C.A. No. 82–0192 (D.D.C. June 20, 1986) [available on WESTLAW, 1986 WL 15521]. They argue that these services constitute in effect "Official Services," which represent communications between personnel or equipment of a Regional Company located in various areas and communications between Regional Companies and their customers. *See United States v. Western Electric Co.*, 569 F.Supp. 1057, 1097 (D.D.C.1983).

tween the subscriber's premises and the ISP will be provided in its entirety by the interexchange carrier selected by the ISP. *Id.*

■ The outcome of this debate is at the moment tied to the characterization of the technical operations used to connect the subscriber to the network. If a subscriber is considered to have accessed the gateway upon achieving contact with the PAD, there would by definition be no inter-LATA transmission and the Regional Companies could provide the service. On the other hand, if access to the network is found to occur only when the subscriber interacts with the gateway functions, stored in another LATA, an inter-LATA communication will have occurred, and MCI may well be correct in arguing that the Regional Companies would therefore be providing interexchange service in violation of the decree.

This controversy has emerged for the first time in the context of motions for amendment of judgment pursuant to Fed. R.Civ.P. 59(e), a most improper forum for a dispute of this nature. MCI has failed to show either a "manifest error of law or fact" or newly discovered evidence of the type required for application of Rule 59(e).

Furthermore, if the Court were to address this question in the form presented, it would be required to rule on what might turn out to be a close question without the benefit of a concrete factual record, a fully briefed round of comments from the parties and intervenors, or the recommendation of the Department of Justice. It may well be that resolution of this matter will ultimately require intervention by the Court. However, if and when that intervention becomes necessary, consideration of the issues should and will be undertaken in an orderly fashion and under the procedures previously established for adjudication of questions relating to the consent decree.

## VI

A memorandum subscribed by a number of respected public interest organizations [17] has suggested to the Court that it has been too lenient in allowing the various parties and intervenors to file comments, responses, further discussions, replies, and the like, often out of time, and that these submissions have then generated further rounds of submissions, to an inordinate extent. Says the memorandum filed by the National Consumers League, et al. (at pp. 2–5):

> Since the Court's March 7, 1988 decision, only three post-judgement [sic] motions have been submitted in a timely fashion ... If these were the only requests, the issues might now be ready for decision. But subsequently, and under the guise of "responses" to the above motions, three separate additional requests for reconsideration or clarification were submitted [one of which] contains a new request for clarification with respect to the potential for interLATA electronic mail services [and that, in turn] is likely to prompt an onslaught of responses, and that each response itself will prompt a further reply, *etc., ad nauseam....*

> The Court has clearly challenged the industry, and the Regional Companies specifically, to perform to the level of their promises made throughout this proceeding to bring information age services to the residential, non-profit, and small business users. Most of the Regional Companies have announced intentions to move rapidly into the audio and videotex markets, some announcing intentions to establish tests and services in 1988. It is time to put the companies to the test.

These suggestions are well taken, and the Court expects to implement them as follows:

First. Since this obviously is not an ordinary case but has involved, particularly in

---

17. National Consumers League, Black Citizens for a Fair Media and the Council of Churches of New York City, National Association of State Universities and Land Grant Colleges, Native American Public Broadcasting Consortium and the National Indian Youth Council, Office of Communications of the Church Federation of Greater Chicago, Consumer Interest Research Institute, Public Interest Computer Association, and National Association for Better Broadcasting.

the early stages, the structure of an entire industry, the Court has been extremely liberal in allowing every corporation, association, or governmental entity, and every other interested party almost unlimited opportunities to submit views and responses to the views of others. As in connection with the present round of motions, the consequence has sometimes been to extend the process inordinately, far out of proportion to the complexity of the actual controversies involved, especially as much of the material filed in replies and surreplies turned frequently out to be cumulative and repetitive.

The point has now been reached in this litigation when the interests involved can adequately be protected and the Court can be fully informed even if the limits set by the federal and local rules of procedure are more faithfully observed.[18] The Court has neither desire nor jurisdiction to duplicate the work or the processes of regulatory bodies which typically entertain comments from a large number of people on an endless variety of subjects for extended periods of time. The parties and intervenors are on notice that the Court expects to be mindful of these considerations in future proceedings, and that it will far more literally than heretofore enforce the rules of court and of procedure.

Second. Judicial rulings in favor of the positions advocated by Regional Companies have in the past often been followed, not by statements of resolve to take advantage of the new opportunities or by the adoption of imaginative new programs, but by public expressions of disappointment, nay, amazement, that the decree restrictions were not further, or completely, removed. This pattern held even after the Court substantially relaxed the information services restriction.[19]

The Court notes that, prior to the rulings which loosened these restrictions, at least some of the Regional Companies professed the intention, based on those rulings, to build broad-based information services to help to usher in the information age in this nation.[20] Indeed, the decree restriction on information services was relaxed in significant part on account of the benefits that were expected to flow to the American people as a consequence of that relaxation. *Opinion,* 673 F.Supp. at 590–91. Certainly, if future promises are to be accorded credence, the public and the Court have a right to expect that in this respect performance will match the promise.

### VII

For the reasons stated above, it is this 22nd day of June, 1988

ORDERED that Phone Programs, Inc.'s Motion to Alter or Amend Judgment be and it is hereby denied; and it is further

ORDERED that CompuServe, Incorporated's Motion to Amend Judgment be and it is hereby denied; and it is further

ORDERED that Digital Directory Assistance, Inc.'s Motion for Clarification be and it is hereby denied; and it is further

ORDERED that the Florida Public Service Commission's Motion for Clarification be and it is hereby denied.

---

**18.** This also applies to the page limitations set by Local Rule 108(e), which this Court has almost routinely waived in the past.

**19.** *See, e.g.,* BellSouth 1987 Annual Report ("BellSouth was extremely disappointed by [the Court's ruling]. The decision places severe restraints on our role in providing information services—the keys to the Information Age"); Southwestern Bell 1987 Annual Report (the

Court's restrictions "are detrimental to consumers, to the American economy and to this company and its owners").

**20.** *See, e.g.,* Southwestern Bell Comments, October 15, 1987, at 19–20; PacTel Response, November 16, 1987, at 2; US West Reply, November 30, 1987, at 3.