**UTAH POWER & LIGHT COMPANY, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY, et al., Defendant(s).**

No. 87–C–0043–S.

United States District Court, D. Utah, C.D.

April 21, 1989.

Stephen B. Nebeker, Paul S. Felt, John A. Adams, Paul D. Newman, Ray, Quinney & Nebeker, Robert Gordon, David A. Westerby, Michael G. Jenkins, Utah Power & Light Co., Salt Lake City, Utah, for plaintiff.

Donald J. Purser, Barbara Barrett, Purser, Okazaki & Barrett, Salt Lake City, Utah, for Federal Ins. Co.

Carman E. Kipp, William W. Barrett, Kipp & Christian, Salt Lake City, Utah, for Twin City Fire Ins. Co. and First State Ins. Co.

Raymond J. Etcheverry, Kent O. Roche, Parsons, Behle & Latimer, Salt Lake City, Utah, James T. Jensen, Jensen Law Offices, Price, Utah, for Emery Min. Corp.

B. Lloyd Poelman, Kirton, McConkie & Poelman, Salt Lake City, Utah, George E. Sayre, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for Allianz & Cal Union Ins.

Thomas P. Kane, Edward M. Laine, Bethany K. Culp, Oppenheimer, Wolff & Donnelly, St. Paul, Minn., for St. Paul Surplus Lines Ins.

Terry M. Plant, John Braithwaite, Hansen, Epperson & Smith, Salt Lake City, Utah, for Alexander and Alexander.

P. Keith Nelson, Michael P. Zaccheo, Gary L. Johnson, Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for defendant/third-party plaintiff Intern. Ins. Co.

## DECISION

SAM, District Judge.

This declaratory judgment action to recover contribution of $22 million from insurers is before the court on the objection of plaintiff Utah Power and Light (Utah Power) to the magistrate's report and recommendation (R & R) denying Utah Power's motion for partial summary judgment. Utah Power seeks a determination that primary carrier defendant Federal Insurance Company (Federal) and excess carrier defendants International Insurance Company (International), Twin City Fire Insurance Company (Twin City) and First State Insurance Company (First State) may not refuse contribution to or challenge the settlement amount in *Carter v. Utah Power & Light*, Civil No. 68596 (filed in the Fourth Judicial Court of Utah County, State of Utah) on their asserted ground the settlement was excessive and unreasonable under the circumstances. Utah Power argues, unless the defendants can show Utah Power settled in bad faith or by collusion, they cannot now refuse contribution to or challenge the reasonability of the settlement because they abandoned the defense of *Carter* and refused to settle the claims against Utah Power within policy limits. Federal responds it exhausted its duty to defend by tendering its policy limit; the remaining defendants allege the defense was never tendered them and therefore assert they could not have abandoned because they had no duty to defend. The magistrate recommends, without analysis, Utah Power be denied summary judgment, because the issue whether the insurers abandoned Utah

Power's defense raises a question of material fact.

## I. *Uncontested facts*

On December 19, 1984 a large fire in the Wilberg Mine resulted in the deaths of 27 miners. The miners' heirs began filing suits against Utah Power (the owner of the mine) which were eventually consolidated in *Carter.* At the time of the fire, Emery Mining Corporation (Emery) operated the Wilberg Mine under an agreement requiring Emery to insure and indemnify Utah Power from claims arising from Emery's operation. Emery carried four layers of general liability insurance for total coverage of $50.5 million:

| | |
|---|---|
| Federal | Primary; first $500,000 |
| International | Umbrella; next $10 million |
| Twin City and First State | Following form excess; next $20 million |
| Federal | Following form excess; next $20 million |

On February 19, 1985 David A. Westerby, counsel for Utah Power, sent all liability insurance carriers a letter that discussed the status of the claims against Utah Power and contained the following request for action:

*Utah Power looks to the liability insurance carriers (both groups) [referring to the Emery and Utah Power lines of insurers] to defend it in this action and to pay all judgments, settlements, and related costs and expenses. With the variety of policies involved, the obligations of the various companies will vary. Utah Power insists, however, that the companies work together in a good faith effort to protect Utah Power's interests. If Utah Power may be of any assistance in facilitating a plan of operation among the insurers, please advise.* Utah Power is willing and eager to help in the defense in any appropriate way. We pledge our full cooperation.

The most immediate matter at hand is the retention of counsel and the filing of a response to the First Amended Complaint. Utah Power strongly urges that the firm of Ray, Quinney & Nebeker, ... be retained as local, lead counsel. Utah Power has enjoyed a close, working relationship with Stephen B. Nebeker, a senior partner in the firm, for many years.... Utah Power would also recommend that counsel expert in mine fire litigation be employed to work closely with local counsel in the investigation and discovery phases of the case.

Under the circumstances, it appears appropriate to look to Federal Insurance Company, Emery Mining's primary carrier, to retain counsel and take the lead in planning the defense....

If any of you have comments or additional questions regarding this lawsuit or Utah Power's position with respect to it, please contact me....

Westerby's February 19, 1985 letter at 5 (emphasis added). Utah Power considers this letter a tender of defense to the Utah Power and Emery lines of insurers. Federal, the primary carrier in the Emery line, agreed to accept the defense under a reservation of rights:

The Federal Insurance Company, in an effort to further facilitate the successful litigation of the claims brought against Utah Power & Light by the plaintiffs, has and hereby does agree to provide for the reasonable costs of insurance defense counsel for UP & L. The Federal Insurance Company agrees to pay a reasonable insurance defense counsel's fee for the greater Salt Lake City Metro Area to Ray, Quinney & Nebeker for so long as Federal Insurance Company is obligated to be responsible for defense cost....

While we have agreed to step in and undertake of the defense of Utah Power & Light, ... we hereby inform you that we reserve our rights to deny any requirement on our part to indemnify or contribute to indemnification of any claims settled or awarded in favor of the plaintiffs....

The Federal Insurance Company is undertaking to pay for the defense of Utah Power & Light in this case without waiving any rights that exist under the insurance contract between Federal Insurance Company and Emery Mining Corporation. We again reserve the right to raise

any exclusions or conditions which may exist under the insurance contract which have not been alluded to in this letter. . . .

Westerby kept all insurers apprised of action in the case as it progressed. By letter of January 14, 1986 Westerby informed the excess carriers Federal had not yet responded to Utah Power's demand for reimbursement of defense costs incurred to that date and Utah Power intended to seek apportionment among the excess carriers of the costs that exceeded Federal's policy limit of $500,000.

> We understand that Federal Insurance may tender its $500,000 policy limits in an effort to shift the defense burden to another carrier and avoid further defense costs. Under the circumstances of this case and the minimal limits of liability of the primary carrier, it might be proper to apportion defense obligations under the equitable apportionment theory. The gist of the theory is that where the unliquidated claim clearly exceeds the primary insurer's policy limits, the vigorous defense of the action inures to the benefits of the excess insurers, thereby making it inequitable to force the primary insurer to bear the entire cost of defense. Cases appearing to support such a theory include *Celina Mutual Insurance Co. v. Citizens Insurance Co., of America,* 133 Mich.App. 655, 349 N.W.2d 547 (1984) and *Aetna Casualty & Surety Co. v. Surgeon Underwriters at Lloyds of London, England,* 55 [56] Cal.App.[3d] 791, 129 Cal.Rptr. 47 (1976). Regardless of whatever arrangements the Emery Mining carriers make among themselves for defense costs, Utah Power claims that it is entitled to prompt reimbursement of defense costs as they are incurred.

Westerby's January 12, 1985 letter at 7.

During 1986 Utah Power began urging the Emery line to settle the litigation, and the Emery line insisted the Utah Power line become involved in the negotiations. Throughout the year Utah Power hosted several meetings in Salt Lake City at which Stephen Nebeker informed all carriers of Utah Power's settlement efforts. At one point Federal proposed using its $500,000 to settle two or three of the claims. Utah Power rejected Federal's proposal saying, *inter alia,* early settlement of some of the claims would result in piecemeal, unreasonable and inequitable distribution of the settlement funds. Federal again attempted to tender its limits by proposing the $500,000 be distributed on a pro rata basis among the 28 plaintiffs. Utah Power rejected that proposal saying the settlement offers would be so low as to offend the negotiation process.

On December 31, 1986 Federal sent all carriers a letter that set out its own settlement efforts rejected by Utah Power; tendered for a third time its $500,000 policy limit; and notified Federal would no longer make interim payments of the defense costs, because the costs had nearly reached its $500,000 policy limit.

> We are in accord with most everyone present at the meeting on December 29, 1986, that the case should be settled forthwith and that the insurance coverage disputes can be argued later. . . . On behalf of Federal Insurance Company, you are hereby tendered its primary policy limits, in the amount of $500,000, for purposes of settling as many claims as you may be able to settle with the said available policy dollars. If you have determined that you cannot obtain contribution from International Insurance or any of your own insurance carriers, and wish to contribute monies of your own in addition to our $500,000, you may feel free to do so. This tender is being made to you without waiver of any of the rights reserved to Federal under previous notice or otherwise under its insurance contract issued Emery Mining Company, under which UP & L claims some entitlement to benefits of said insurance contract.
>
> *With this tender, we hereby inform you that we will no longer be agreeing to make interim payments for any defense costs; rather, we suggest that you absorb this cost yourself or, at your prerogative, make demand upon either your insurance carriers or one of the*

*Emery excess carriers for payment thereof.* As you are aware, all of these interim payments we have made, have been made while reserving any and all rights we may have under the insurance contract.

Purser's December 31, 1986 letter at 4 (emphasis added). Federal did not pay for defense costs incurred after September 16, 1986.

Utah Power continued settlement negotiations and, by letter dated March 6, 1987, informed all insurers of its intent to settle *Carter* for $22 million, requesting the insurers to consent to the settlement amount by March 11, 1987. Having received no objections by that date, Utah Power agreed to the proposed settlement package designed to extinguish all wrongful death claims arising from the Wilberg Mine fire: $11,943,382.92 in present payments and $10,045,998.87 in future payments, for a total of $21,989,381.79. Utah Power notified all carriers of the settlement, by letter dated March 19, 1987, and once again requested they fund it. Utah Power alleges Federal consented and specifically stated it would not challenge the amount. By letter dated March 12, 1987, International consented to the settlement amount and agreed to contribute its policy limit of $10 million subject to certain conditions, none of which reserve the right to contest the reasonableness of the settlement. The remaining insurers made no objection to the settlement amount until some time after the agreement was entered.

## II. *Summary judgment*

██ Under Fed.R.Civ.P. 56, summary judgment is proper only when the pleading, affidavits, depositions or admissions establish there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party.[1] *E.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden

has two distinct components: an initial burden of production on the moving party which burden when satisfied shifts to the nonmoving party and an ultimate burden of persuasion that always remains on the moving party. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (2d ed. 1983).

When summary judgment is sought, the movant bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record and affidavits, if any, it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. "[T]here can be no issue as to any material fact ... [when] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

Once the moving party has met this initial burden of production, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

> If the defendant in a run-of-the-mill civil case moves for summary judgment ... based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakenly favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict....

*Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the mate-

---

1. Whether a fact is material is determined by looking to relevant substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

rial facts." *Matsushita. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).[2] The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. If the nonmoving party cannot muster sufficient evidence to make out a triable issue of fact on his claim, a trial would be useless; and the moving party may be entitled to summary judgment as a matter of law. *Id.*

### III. Whether Federal may contest the reasonability of the settlement

 Where, as here, an insured settles a third-party action with its own funds and then seeks recovery from its insurer, the insurer bears the burden to show what a reasonably prudent person in the position of the defendant would have settled for on the merits of the claim. *United Services Auto. Assoc. v. Morris*, 154 Ariz. 113, 741 P.2d 246, 253 (1987); *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn.1982). However, an insurer that abandons the defense of its insured is bound by and may not contest the terms of a settlement agreed to by the insured unless the agreement should be entered in bad faith or be unconscionable on its face. *Losser v. Atlanta Int'l Ins. Co.*, 615 F.Supp. 58, 61 (D.Utah 1985). Because the court finds no material facts in dispute regarding what transpired between Utah Power and Federal,[3] it will analyze

**2.** The *Matsushita* Court stated that if the factual context should render a party's claim "implausible," the party must "come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Id.*, 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d 538. The setting of this statement is a discussion whether the plaintiff/nonmovant on a motion for summary judgment could prove (for antitrust liability purposes) the defendant/movant willingly joined an illegal boycott, solely on the evidence the defendant refused to deal with the plaintiff. The defendant had no economic incentive to join the boycott, and his refusal to deal was consistent with his independent interest. The Court noted that although, in isolation, the defendant's refusal to deal would raise a triable issue of fact; in the factual context where the defendant lacked any rational motive to join the boycott, the mere fact he refused to deal with the plaintiff was insufficient to defeat summary judgment.

**3.** Federal asserts there remain material facts in dispute concerning Utah Power's rejection of Federal's efforts to tender its policy limit to settle *Carter*. The essence of Federal's assertion is that Utah Power acted unreasonably or in bad faith by refusing to communicate or support Federal's settlement offers.

By letter dated June 6, 1986, Westerby informed Federal he had relayed Federal's settlement offers to Stephen Nebeker and Paul Felt (Nebeker's co-counsel) and they had advised against making the offers for the following reasons:

1. The total sum of $500,000 would not cover the workers' compensation lien, which Westerby estimated to be about $900,000 at that time. The plaintiffs had no incentive whatsoever to accept such an offer.

2. Utah Power's counsel estimated the average settlement value *per family* exceeded the $500,000 Federal was making available.

3. The offer would have been relayed to the plaintiffs by their counsel and could have been considered so "ridiculously low" as to "engender bad feelings among the plaintiffs that would likely spread in the small communities, possibly to [the] jury pool."

4. When those who had not filed would hear Utah Power had offered money, they may have wanted to bring suit; and it was undesirable to encourage litigation.

5. The strategic nature of Federal's offer could be misunderstood by the community and cause damage to Utah Power's reputation.
Westerby's letter of June 6, 1986 at 1.

The court considers these reasons sufficient to meet Utah Power's initial burden of showing it acted in good faith by rejecting Federal's tenders of its policy limits. In support of its claim, Federal brings forth nothing except the mere fact Utah Power rejected the tenders. Applying *Matsushita*, the court concludes Federal's assertion Utah Power acted unreasonably or in bad faith is "implausible" where Utah Power appears to have been acting not only in its independent interest but in the interest of all the carriers involved. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d 538. The court's determination is underscored by the fact that as late as December 31, 1986, the date of Federal's letter announcing it would no longer fund the defense, Federal supported a settlement amount of $30.5 million and recognized the amount per family would probably exceed $1 million. Purser's letter of December 31, 1986 at 3. In fact Federal criticized Utah Power's rejection of the plaintiffs' $30.5 million offer and cited that rejection as a cause for Federal's unwillingness to continue funding the defense. *Id.*

As stated in *Matsushita*, if the factual context should render a party's claim "implausible," that party must "come forward with more persuasive evidence to support [its] claim than would oth-

whether as a matter of law Federal abandoned the defense of *Carter,* thereby waiving its right to contest the settlement amount.

Federal's coverage provision in the Emery insurance contract reads,

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage (A). *bodily injury* or
>
> Coverage (B). *property damage*
>
> *to which this insurance applies,* caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but *the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.*

(Emphasis added.) Federal contends the phrase "to which this insurance applies" limits the scope of defense to the policy limits thereby allowing Federal to tender its limits and be relieved of its duty to defend before settlement or final adjudication of the case. Utah Power asserts the final phrase "exhausted by payment of judgments or settlements" requires Federal to defend through conclusion of litigation whether by settlement or judgment.

The courts are not unanimous on the question whether an insurer may tender its policy limits and withdraw from defense of the insured's claim without the consent or determination of liability of the insured. *See, e.g., Samply v. Integrity Ins. Co.,* 476 So.2d 79, 81 (Ala.1985). At the outset the court must "recognize that the insurer's undertaking with respect to defense of the insured must be determined by the particu-

lar contract of insurance between the parties. [The court] must examine the policy to determine whether it imposes a continuing duty to defend under the facts here." *Anderson v. United States Fidelity & Guar. Co.,* 177 Ga.App. 520, 339 S.E.2d 660, 661 (1986) (quoting *Liberty Ins. Co. v. Mead Corp.,* 219 Ga. 6, 131 S.E.2d 534, 535 (1963)); *see Landando v. Bluth,* 292 F.Supp. 975, 976 (N.D.Ill.E.D.1968) ("[E]ach case involving a promise to defend must be considered independently on the basis of the particular language in the contract at issue"). Further, "[w]hen construing language covering an obligation such as the insurer's duty to defend the insured, courts must look to the reasonable expectations of the insured." *Gross v. Lloyds of London Ins. Co.,* 121 Wis.2d 78, 358 N.W. 2d 266, 271 (1984) (citing *Kocse v. Liberty Mut. Ins. Co.,* 159 N.J.Super. 340, 345–46, 387 A.2d 1259, 1262 (1978)).

*Lloyds* sets out the history of defense clauses in standard form liability policies. In 1966 the policy language was amended to contain the following explicit definition of the insurer's right to terminate the defense of the insured:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay ... *but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.*

*Lloyds,* 358 N.W.2d at 270 (quoting 1 R. Long, *The Law of Liability Insurance* § 5.12 at 5–74 (1984) (emphasis added in *Lloyds* )).

> The 1966 revisions were meant to clarify when the insurer's duty to defend the insured has been satisfied by providing that the duty to defend ceases after the policy limits are exhausted either by payment of judgments or settlements. 7C J. Appleman, *Insurance Law and Practice* § 4682 at 29. Despite the clear policy

erwise be necessary." *Id.* For the above reasons the court concludes Federal did not meet its somewhat enhanced burden to show the ex-

istence of a disputed material fact, and therefore Federal's assertions are insufficient to defeat summary judgment.

language, Appleman cautions that the insurer's duty to defend the insured may continue even after the policy limits have been exhausted:

'Despite the 1966 and subsequent revision, the primary insurer may not walk away from the insured by paying relatively low limits into court and abandon the insured with a substantial judgment simply because the cost of appeal or other handling may be formidable. The insured's interests may demand continued protection despite threatened exhaustion of the primary limits.' *Id.* at 36 (footnote omitted).

*Lloyds,* 358 N.W.2d at 270. *See Conway v. Country Casualty Ins. Co.,* 92 Ill.2d 388, 65 Ill.Dec. 934, 937, 442 N.E.2d 245, 248 (1982). This court notes Professor Appleman's comment relates to defending through appeal or subsequent judgments or settlements; the 1966 amendment clearly requires defense through an initial judgment or settlement.

The *Lloyds* policy did not contain this standard language; rather, it defined the insurer's right to terminate the defense of its insured as follows:

[T]he Company shall defend any suit alleging ... bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent; but the Company may make such investigation and settlement of any claim or suit as it deems expedient, *but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements or after such limit of the Company's liability has been tendered for settlements.*

*Id.* 358 N.W.2d at 268–9 (emphasis added in *Lloyds* ). That court termed the 1966 standardized provision, "payment of judgments

or settlements" language, and the *Lloyds* provision, "tendered for settlements" language. *Id.* at 271. Despite the explicit "tendered for settlements" language in the *Lloyds* policy, the court held the insurer had a duty to defend through judgment or settlement, because, where the defense provision departed from standardized language *but was not highlighted,* the insureds had a reasonable expectation "the policy language in use by the industry since 1966 would be present in new policies unless they were *specifically* given notice of a change." [4] *Id.* (emphasis added).

Because any limitation on the insurer's duty to defend is in the nature of an exclusion, the defense coverage must clearly express the limitation.... [Where] the 'tendered for settlements' language was a substantial change from past industry practice and because [the insured] received no notice at the time of the accident that Imperial could terminate its defense efforts upon tender of the policy limits, we hold that Imperial's tender of the policy limits into court does not relieve it of its duty to defend [the insured] in the lawsuit.

In order for an insurer to be relieved of its duty to defend upon tender of the policy limits, the 'tendered for settlement' language must be highlighted in the policy and binder by means of conspicuous print, such as bold, italicized, or colored type, which gives clear notice to the insured that the insurer may be relieved of its duty to defend by tendering the policy limits for settlement.

*Id.* "In the absence of an explicit clause in the insurance policy addressing the right to tender the insurance coverage, a case for not allowing the defense obligation to be discharged by a tender could be predicated on the existence of an ambiguity." *Id.* Ambiguity in the insurance contract must be construed against the insurer. *Millers' Mut. Ins. Assoc. of Ill. v. Iowa Nat. Mut. Ins. Co.,* 618 F.Supp. 301 (D.Colo.1985)

**4.** The *Lloyds* position that the insurer has a duty to defend through settlement or judgment unless the policy should contain highlighted "tender for settlement" language is emphasized by the apparent need for the recent movement to include in defense provisions express language limiting the insurer's duty to defend only through exhaustion of policy limits. R. Keeton & A. Widiss, *Insurance Law* § 9.4, at 1042 (1988).

(holding the primary insurance carrier may not terminate defense after depositing its policy limits in the court by interpleader; the phrase "exhausted by judgment or settlements" does not contemplate interpleader).

The instant defense clause contains no such "tender for settlement" language or explicit clause limiting Federal's duty to defend to exhaustion of its policy limits. The clause reads, "but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted *by payment of judgments or settlements or after such limit of the Company's liability has been tendered for settlements."* (Emphasis added.) Construing identical language, the court in *Conway* held the clear language of the policy prohibited the insurer from terminating its defense by tendering the policy limits.

> Our holding that an insurer cannot discharge its duty to its insured simply by making payments to the claimant to the extent of its policy limits is clearly supported by the language of the policy here. . . . [T]he policy provided that the insurer could terminate its obligation to defend and pay by payments to the policy's limits of 'any judgments or settlements.' The insurer here, of course, made no payment pursuant to a judgment or a settlement agreement.

442 N.E.2d at 248. Other authority states that under the terms of the policy, such as Emery's, the "unilateral action" of tendering the policy limits for settlement is "not a payment of the judgment or settlement" and, for public policy reasons, should not

be allowed. 7C J. Appleman *Insurance Law and Practice* § 4682 at 33.

> Such action invites a change of attorneys and other staff, condemned [by case authority] and can subject the insured to questions as to who will provide him a defense. It also allows the primary insurer to abandon the insured simply because it finds the costs of handling burdensome and thus escape its responsibility under the policy.

*Id.* (footnote deleted). "It should be noted that the costs of investigation and trial can be substantial and will be borne by the primary carrier." *Id.* at 36.

Indeed, the *Samply* court determined that even when the defense clause contains explicit limiting language ("Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted"), "the general rule is that an insurer is not absolved of its duty to defend in the latter situation where the policy limits are tendered, without the consent of the insured, prior to settlement or judgment." *Samply*, 476 So.2d at 81 (citing Zulkey & Pollard, The Duty to Defend After Exhaustion of Policy Limits, For the Defense, June 1985, at 21, 23). *Samply* states, "It is . . . well settled that an insurer's duty to defend is broader than its duty to pay." *Id.* at 84; *Oxford Lumber Co. v. Lumbermens Mut. Ins. Co.* 472 So.2d 973 (Ala.1985); *Upton v. Mississippi Valley Title Ins. Co.,* 469 So.2d 548 (Ala.1985); *Allstate Ins. Co. v. Shirah,* 466 So.2d 940 (Ala.1985); R. Keeton & A. Widiss, *supra,* § 9.4, at 1038 (insurer's two duties to defend and indemnify are separate and distinct; duty to defend is not dependent on and is broader than duty to indemnify). Setting out ample authority for its position,[5] *Samply* held,

---

5. The following is an excerpt from *Samply's* recitation of supporting authorities:

Citing cases holding that the insurer's duty to defend continued where no settlement or judgment existed, the *Keene Corp.* court stated:

The courts' concern was that by tendering the limits, the insurer would avoid all burdens of defense, even those associated with the payment of the policy limits. Thus, the insured would receive no defense coverage as provided by the policy. 'The defense of such suits by the insurer is a valuable right of the

insured for which he pays and to which he is entitled by the very words of the policy.' *American Casualty Co. of Reading, Pa. v. Howard,* 187 F.2d [322] at 327 [4th Cir.1951]; *see also, Simmons v. Jeffords,* 260 F.Supp. 641, 642 (E.D.Pa.1966) ('[A] most significant protection afforded by the policy—that of defense—is rendered a near nullity' if the duty to defend terminates upon tendering the limits); 7C J. Appleman, *Insurance Law and Practice* § 4682 at 36 (rev. ed. 1979) (The decisions that required a continuing duty to defend were 'a way to make sure the insurer

"the better rule of law is that an insurer, when it obligates itself to defend, ... cannot avoid its duty to defend against the insured's contingent liability by tendering the amount of its policy limits. into court without effectuating a settlement or obtaining the consent of the insured." A similar result is reached in *Anderson*, 339 S.E.2d 660. The *Anderson* defense provision also contained explicit limiting language ("Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted ..."), and that court held the insurer may not be relieved of its obligation to defend its insured by paying the policy limits into the court. *Anderson* cites the general rule set out in *Samply*, then reasons,

> '[T]he insurer's duty is both to defend actions *and* to pay judgment against the insured. Otherwise, where the damages exceed the policy coverage, the insurer could walk into court, toss the amount of the policy on the table, and blithely inform the insured that the rest was up to him. This would obviously constitute a breach of the insurer's contract to defend actions against the insured, for which premiums had been paid, and should not be tolerated by the courts.'

*Id.* at 661 (quoting *National Casualty Co. of v. Insurance Co. of N. Am.*, 230 F.Supp. 617, 622 (N.D. Ohio 1964) (emphasis in original)).

would not abandon the insured by simply depositing its limits in court').
[*Keene Corp. v. Insurance Co. of N. Am.*, 597 F.Supp. 946, 952 (1984), *vacated as moot*, 631 F.Supp. 34 (D.D.C.1985) ].
....
The standard automobile liability policy obligates the insurer to pay on behalf of the insured all sums which the insured becomes legally obligated to pay as damages.... However, this obligation to 'defend any suit' refers not only to the type of coverage, but also to the amount of coverage afforded by the policy. It follows that the insurer is not required to defend remaining claims and suits after it has exhausted the policy limit in *settling suits* arising from the same accident. [Corley & Gamble, Alabama Law of Damages, at 27–3 (1982) ] (Emphasis added.)
A publication of the insurance defense industry itself, *see* Zulkey & Pollard, *supra*, at 23, discusses the issue of termination of liability, and concludes:

This court notes, as did the *Samply* court, 476 So.2d at 82, that in the majority of cases cited by the insurer for the proposition it may terminate defense by tendering policy limits, there was either a settlement or judgment exhausting the policy limits prior to the insurer's seeking to withdraw its defense or the policy contained express limiting language: *General Casualty Co. of Wis. v. Whipple*, 328 F.2d 353 (7th Cir.1964) (insurer paid policy limits after judgment and was excused from defending future suits); *McCarthy*, 8 A.2d at 750 (insurer allowed to withdraw after defending through one of two judgments; however, insurer could neither cast burden of defense on insured from the beginning nor abandon mid-course so as to prejudice insurer's rights); *National Union Ins. Co. v. Phoenix Assurance Co. of N.Y.*, 301 A.2d 222 (D.C.Cir.1973) and *Commercial Union Ins. Co. of N.Y. v. Adams*, 231 F.Supp. 860 (S.D.Ind.1964) (express limiting language); *Zurich Ins. v. Raymark Ind.*, 118 Ill.2d 23, 514 N.E.2d 150 (1987) (general rule that insurer who exhausts policy limits by judgment or settlement no longer has duty to defend).

The one decision that does not fit these distinctions is *Denham v. La Salle–Madison Hotel Co.*, 168 F.2d 576 (7th Cir.) (holding an insurer's duty to defend terminates with the exhaustion of its policy limits), *cert. denied*, 335 U.S. 871, 69 S.Ct. 167, 93

'Even in jurisdictions that have followed *McCarthy* [*Lumbermen's Mut. Casualty Co. v. McCarthy*, 90 N.H. 320, 8 A.2d 750 (1939) (allowed insurer to withdraw defense after reaching judgment on one of two claims) ], and have held that an insurer can terminate its defense obligation by paying the maximum amount of coverage specified by the policy, it has been widely accepted that the insurer cannot avoid its obligation to defend against an insured's contingent liability by early payment of the policy limits without effectuating a settlement or without obtaining the permission of the insured.... However, when a settlement is reached in which the insured consents and contributed beyond the insurer's payment of its policy limits, clearly any duty to defend will cease. *Liberty Mutual Insurance Co. v. Mead Corp.* [219 Ga. 6, 131 S.E.2d 534 (1963) ]' (Citations omitted.)
*Samply*, 476 So.2d at 83.

L.Ed. 415 (1948). The *Denham* court considered dispositive the language *"as respects insurance afforded by this policy,* [the insurer] shall ... defend any claim ...," *id.* (emphasis added), and held the emphasized phrase limited defense coverage to the policy limit. *Id.* at 584. This court notes *Denham* was decided before the 1966 amendments and there is no language in the policy regarding defense through "judgment or settlement." *Id.*

■ Here, Federal argues the phrase "to which this insurance applies" is limiting language under which termination of the *Carter* defense was proper in light of the imminent exhaustion of Federal's policy limits. The court rejects that argument on the basis it believes the alleged limiting language relates to the scope of the claims that may be brought against Federal, not to its duty to defend. Indeed, the case Federal cites in support of its position, *Deseret Fed. Sav. v. United States Fidelity & Guar.,* 714 P.2d 1143 (Utah 1986), concerns an insured who alleged facts to support claims for "breach of covenant of quiet enjoyment and constructive eviction" under a policy covering only bodily injury and property damage. *Id.* at 1147. Holding the insurer had no duty to defend because it had no duty to indemnify, the Utah Supreme Court recognized

> the duty to defend is broader than the duty to indemnify, but the insurer's obligation is not unlimited; the duty to defend is measured by the *nature and kinds of risks covered by the policy* and arises whenever the insurer ascertains facts which give rise to the potential liability under the policy. *Gray v. Zurich Insurance Co.,* 65 Cal.2d 263, 275–77, 54 Cal.Rptr. 104, 113, 419 P.2d 168, 177 (1966).

*Id.* at 1146 (emphasis added). The *Deseret Federal* position is supported by insurance law treatise:

> [I]t is clear that the scope of an insurer's responsibility is a function of the coverage terms. In other words, an insurer is not liable for the defense of all claims that may be made against an insured. Thus, for example, a *motor vehicle* insurance policy does not obligate an insurer to indemnify an insured for defense expenses when an *airplane* or *boat* owned by the insured is involved in an accident. Once a court has decided the insurance policy at issue does not provide coverage, that determination effectively speaks to the insurer's obligation: the court has concluded that the coverage does not apply, and that decision should be equally applicable to the defense expenses.
>
> The proposition that the defense obligation is more extensive than the insurer's obligation to indemnify is often an appropriate working rule in the absence of a declaratory adjudication of the coverage question. It provides a common sense, pragmatic approach to the allocation of the responsibility for the defense expenses in many of the situations which frequently arise.... Viewed pragmatically, the allocation of the defense obligation to the insurer serves to minimize the number of legal proceedings and the associated expenses for the insured and the insurer.

R. Keeton & A. Widiss, *supra,* § 9.4, at 1029 (footnote omitted).

■ This court determines the phrase "to which this insurance applies" relates to the nature and kinds of risks covered by the policy and not to Federal's broad duty to defend. That duty is covered by the explicit language requiring Federal to defend until its policy limits are exhausted through judgments or settlements.

■ For these legal reasons and because Federal failed its burden to show Utah Power acted in bad faith by not using the tendered policy limits according to Federal's instructions; declined, without Emery's consent, to fund the *Carter* defense after September 16, 1986; and did not object to the settlement at the time it was reached; the court concludes as a matter of law, applying *Losser,* Federal abandoned the defense of *Carter* and therefore may not now refuse contribution to or contest the reasonability of that settlement.

IV. *Whether the excess carriers may contest the reasonability of the settlement*

Utah Power argues the excess carriers waived their rights to contest the settlement amount by neither objecting nor reserving the right to object at the time of settlement. The excess carriers respond the defense was never tendered them and therefore assert they may contest the settlement amount because they could not have abandoned what they had no duty to defend.

The court first acknowledges the *Carter* action was somewhat different from the usual primary/excess carrier scenario in that, because independent counsel was employed, Federal's abandonment of the defense did not leave Emery and Utah Power without representation. Second, it notes this action is not for recovery of the defense costs arising after September 16, 1986. This action simply requests a declaratory judgment that, on these facts, the excess carriers may not contest the settlement amount because they did not object to it at the time it was agreed upon. (Indeed International expressly agreed to the terms of the settlement agreement and pledged its policy limits toward funding it.)

By regularly held meetings and detailed correspondence, these excess carriers were involved in the settlement negotiations and other pretrial activity from the commencement of *Carter*. There is no indication they objected to the appointment of independent counsel or any actions taken by that counsel during negotiations, and they do not now claim, in their opposing memoranda, the settlement agreement was reached through bad faith or is unconscionable on its face. None of the excess carriers attempted to step into the *Carter* defense after Federal terminated, even though they were liable to indemnify claims that exceeded Federal's policy limits and, arguably, had a potential duty to fund

the defense.[6] *See, e.g., Millers' Mut. Ins.,* 618 F.Supp. at 304 (quoting *American Fid. Ins. Co. v. Employers Mut. Casualty Co.,* 3 Kan.App.2d 245, 593 P.2d 14 (1979) ("where the claim is over the policy limits of the primary policy and only one insurer undertakes the defense, the primary insurer and the excess insurer will each be liable for a pro rata share of the costs of defense in proportion to the amount of the claim each is required to pay")). Utah Power gave the excess carriers an opportunity to object before the settlement agreement was entered, and not only did they fail to object then, but they did not object until some time after the agreement was entered.

The court is aware of no authority that addresses directly the question whether, when the primary carrier abandons its insured's defense in an action handled by independent counsel and of which the excess carriers have been kept apprised, the excess carriers waive their rights to contest a settlement amount by not objecting or reserving the right to object to the settlement at the time it was entered. Nor is it aware of dispositive authority concerning the relevancy (to the present request for declaratory judgment) of the question whether, under facts similar to these, an insured *formally* tendered the defense to excess carriers *after* the primary carrier abandoned.[7] Consequently the court is left to extrapolate its ruling from general principles of insurance law.

Excess insurance is routinely written in the insurance industry with the expectation that the primary insurer will conduct all of the investigation, negotiation and defense of claims until *its* limits are exhausted [in accordance with policy terms].... The duty of the primary insurer is not divisible or limited to those suits that are within the policy limits and the insuring agreement creates a duty to

---

6. The court notes Utah Power informed the excess carriers of the possibility it would seek from them an apportionment of the defense costs, because the unliquidated claim would exceed Federal's policy limits. Westerby's January 12, 1985 letter at 7.

7. The court agrees with Utah Power that Westerby's February 19, 1985 letter was an official tender of the *Carter* defense to all insurance carriers. The question here is whether Utah Power was required to renew formally the tender after Federal abandoned the defense.

defend any suit regardless of the amount claimed against the insured and the excess insurer is a third party beneficiary of that agreement.

7C J. Appleman, *supra*, § 4682, at 28 (footnote omitted). Under policies containing the instant defense provision, the primary carrier retains the duty to defend until the policy limits are exhausted by judgment or settlement. Even where there is "no express provision in the policy that an excess insurer would defend any claims under policy, it has been held that the obligation was implied where the monetary limits of the primary policy had been exhausted...." *Id.* at 31 (emphasis added). Applying this principle to the instant facts and confining its ruling to the question whether the excess carriers may refuse to contribute to or contest the reasonableness of the settlement amount, the court determines the excess carriers had an implied duty to defend that placed them in the position of being required to object to the settlement agreement *after they received notice of it and before it was entered.* Where they do not assert or show any evidence that the settlement agreement is unconscionable or a product of bad faith, their failure to make timely objection or reserve the right to object constitutes a waiver of that right.

The court's position comports with the underlying rationale in *Losser:*

> We join with other courts ... that where ... the insurer refuses to defend on a claim against the policy, and the insured enters into a good faith agreement not deemed to be in the best interests of the insurer, the insurer has assumed the risk that it may be bound to the terms of the agreement.... The agreement is not on its face unconscionable and [the insurer] had every opportunity if it so chose to take steps to protect its interests in the matter.

*Losser,* 615 F.Supp. at 61. Because the present excess carriers had every opportunity to protect their interests but made no objections, they assumed the risk they

would be bound by the settlement agreement and may not now contest it. Moreover they presently offer no specific argument or evidence the agreement was against their interests or a more favorable settlement could have been reached. In light of these conclusions, the court considers immaterial and therefore insufficient to defeat summary judgment the issue whether Utah Power formally tendered the defense to the excess carriers after Federal abandoned.[8]

### V. *Conclusion*

Finding no material fact in dispute, the court grants Utah Power's motion for partial summary judgment thereby entering declaratory judgment that the defendant insurance carriers are barred from contesting the reasonableness of or refusing contribution to the *Carter* settlement agreement.

---

**8.** The court expressly confines its holding to the instant facts and the question presented for declaratory judgment regarding the carriers' right to contest the settlement amount. This decision does not reach the question whether the excess carriers abandoned the defense, for purposes of allocating defense costs or granting any other remedy.