**IT IS HEREBY RECOMMENDED** that plaintiff's motion for summary judgment be denied.

**IT IS HEREBY RECOMMENDED** that defendant's motion for summary judgment be granted.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix,* 897 F.2d 356 (8th Cir.1990).

Dated this 1st day of April, 1992.

The **PACIFIC GROUP, U.S. Hotel Properties Corporation, U.S. Hotel Properties Hotel and Resort Management Company, Wallace Smith, and Horst Osterkamp, Plaintiffs,**

v.

**FIRST STATE INSURANCE CO., Defendant.**

**No. C–90–1624–DLJ.**

United States District Court, N.D. California.

Oct. 7, 1993.

William J. Keegan of The Keegan Law Firm, San Jose, CA, for plaintiff the Pacific Group.

Brian R. Strange of Strange & Hoey, Los Angeles, CA, for plaintiffs the U.S. Hotel.

John N. Frye and Jeffrey A. Katz of Frye & Alberts, Los Angeles, CA, for defendant the First State Ins. Co.

## ORDER

JENSEN, District Judge.

On May 28, 1993, the Court heard the following post-trial motions in this case: De-fendant's motions for a new trial, to alter or amend the verdict, and for judgment not-withstanding the verdict; and plaintiffs' mo-tions for compensatory damages, judgment, and attorneys' fees. Plaintiff The Pacific Group was represented by William J. Keegan of The Keegan Law Firm. The U.S. Hotel plaintiffs were represented by Brian R. Strange of Strange & Hoey. Defendant First State Insurance Company was repre-sented by John N. Frye and Jeffrey A. Katz of Frye & Alberts.

On June 2, 1993, the Court requested sup-plemental briefing on certain issues. All mo-tions were to be deemed under submission on June 24, 1993, the date on which the final supplemental papers were due. In the inter-im, the Court has received numerous letter briefs from the parties. Now, having consid-ered the voluminous papers submitted, the arguments of counsel, the applicable law, and the entire record herein, the Court DENIES defendant's motion for a new trial; DENIES defendant's motion to alter or amend the verdict; DENIES IN PART and GRANTS IN PART defendant's motion for judgment notwithstanding the verdict; GRANTS plain-tiffs' motion for compensatory damages and judgment; and DENIES IN PART and GRANTS IN PART plaintiffs' motion for attorneys' fees.

## I. BACKGROUND

This is an action alleging breach of an insurance contract and breach of the cove-nant of good faith and fair dealing by defen-dant's failure to defend or indemnify certain U.S. Hotel plaintiffs ("the insureds") and de-fendant's failure to participate in settlement discussions.[1]

Trial in this action commenced on Febru-ary 1, 1993. On February 12, 1993, the jury returned a verdict on three issues against the defendant First State Insurance Company ("First State"). First, the jury found that defendant's failure to defend the U.S. Hotel Properties Corporation, U.S. Hotel Proper-ties Hotel and Resort Management Compa-

1. The general background of the present case was more fully set forth in the Court's prior Orders, *see, e.g., The Pacific Group v. First State Ins. Co.*, No. C–90–1624–DLJ (N.D.Cal. Aug. 13, 1991), and the prior Orders are expressly incor-porated herein.

ny, Wallace Smith, and Horst Osterkamp ("U.S. Hotel plaintiffs") proximately caused the settlement and judgment in the underlying Hawaii lawsuit. Second, the jury found that defendant breached its duty to act fairly and in good faith with the U.S. Hotel plaintiffs. Third, the jury found that defendant acted with malice or oppression in its dealings with the U.S. Hotel plaintiffs.

On February 19, 1993, after a second phase of the trial, the jury returned a verdict finding that First State pay punitive damages to the U.S. Hotel plaintiffs in the amount of $21 million.

Following the jury's initial verdict, defendant moved for judgment as a matter of law, arguing that it was entitled to judgment on the bad faith claim and therefore the punitive damages claim as well. The Court denied the motion during a hearing on February 17, 1993.

Not surprisingly, the parties made numerous post-verdict motions. The U.S. Hotel plaintiffs have moved for attorneys' fees, for compensatory damages, and for entry of judgment. The Pacific Group submitted a memorandum in favor of the U.S. Hotel plaintiffs' proposed judgment and in opposition to any diminution of compensatory damages. Defendant, on the other hand, filed motions for a new trial and to alter or amend the verdict or for judgment notwithstanding the verdict. The Court held a hearing on these motions on May 28, 1993. On June 2, 1993, the Court requested supplemental briefing, the last of which was submitted June 24, 1993. The parties have also submitted several unsolicited letter briefs.

## II. DISCUSSION

### A. Defendant's Motion for a New Trial

#### 1. *Legal Standard*

Federal Rule of Civil Procedure ("Rule") 59 permits the Court to grant a new trial, stating that a "new trial may be granted to all or any of the parties and on all or part of the issues...." Fed.R.Civ.P. 59(a). A trial court may grant a new trial if the verdict is "contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1245 (Fed.Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989) (quoting *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir.1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)). A new trial may be granted when the trial court finds that the damages awarded were grossly excessive, clearly not supported by the evidence, or only based on speculation and guesswork. *See Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986), *cert. denied*, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987).

Although the judge may weigh the evidence and assess the credibility of witnesses, and need not view the evidence in a light most favorable to the moving party, "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2806, at 49 (1973)). If, on the other hand, having given full respect to the jury's findings and having reviewed the entire evidence, the judge "is left with the definite and firm conviction that a mistake has been committed," a new trial should be granted. *Id.* at 1372 (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2806, at 49). It is insufficient that the district court would simply have reached a different verdict. *Richardson*, 868 F.2d at 1245.

#### 2. *Analysis*

Defendant First State moves for a new trial on the following grounds: (1) Defendant claims that the contract interpretations and legal opinions by plaintiffs' expert should have been excluded; (2) Defendant argues that the Court's exclusion of Mr. Adler's testimony regarding the *Unocal* case was improper and prejudicial; and (3) Defendant

maintains that the Court should have recognized defendant's right to equitable subrogation.

### a. Testimony of Plaintiffs' Expert Ray Rosecrans

Defendant argues that the contract interpretations and legal opinions by plaintiffs' expert Ray Rosecrans should have been excluded for three reasons.

■ First, First State avers that Rosecrans's testimony concerning his interpretation of First State policies went beyond the proper scope of expert testimony. Rosecrans was called by plaintiffs as an expert to testify to standard claims handling practices within the insurance industry. He testified that Frank Lagana violated the industry standard by determining that First State should not drop down and defend its insureds. Defendant argues that Rosecrans exceeded his proper role of describing industry practice by testifying as to the legal effect of the insurance agreement. For example, defendant quotes Rosecrans as saying that "[t]hey are aware of the drop down problem and this has happened." Transcript, Feb. 9, 1993, at 723–24.

Plaintiffs reject defendant's arguments, noting that Rosecrans did not testify as to First State's contract, but rather to industry standard concerning the duty to drop down. This is proper ground to cover and certainly does not justify a new trial.

■ Second, defendant claims that Rosecrans's testimony concerning his reliance on three court opinions should not have been introduced to the jury because interpretation of judicial opinions is not admissable and the probative value was outweighed by the prejudice to First State. In particular, defendant states that Rosecrans testified that *Hocker v. New Hampshire Ins. Co.*, 922 F.2d 1476 (10th Cir.1991); *Utah Power & Light Co. v. Federal Ins. Co.*, 711 F.Supp. 1544 (D.Utah 1989); and *Continental Casualty Co. v. Synalloy Corp.*, 667 F.Supp. 1523 (S.D.Ga.1983), should have given notice to Lagana of First State's duty to drop down.

The Court instructed the jury that: "You are not asked to decide whether or not those decisions or the statements or the arguments are correct statements of law for this case, so you are not to consider the evidence for that purpose. You can consider that evidence, however, for any bearing it may have on the state of mind of any of the parties who acted for First State in handling the claim of U.S. Hotels in this case." Transcript, Feb. 12, 1993, at 1214. Thus, as to the three legal opinions, the Court specifically refused to allow the cases into evidence, but instead only allowed reference to the cases to demonstrate First State's state of mind since in all three cases First State was a party.

Defendant insists, however, that the probative value was outweighed by the undue prejudice to First State under Federal Rule of Evidence 403. However, defendant did not raise a 403 objection at trial. Moreover, the evidence of the three drop down cases was highly probative as to First State's state of mind and plainly outweighed any prejudice. A new trial is thus not warranted.

Third, First State asserts that Rosecrans's opinion as to the ultimate issue was improperly premised upon inadmissible testimony. Although citing no specific testimony, defendant argues that Rosecrans overstepped the boundaries of acceptable expert testimony by rendering his opinion on the applicable rules of law and application of law to the facts in this case.

This argument will not carry the day. The Court finds no such record of improper testimony, nor has First State directed the Court to any specific improper testimony. Moreover, and more importantly, defendant has made no showing of prejudicial opinion evidence which justifies a new trial.

### b. Exclusion of Erwin Adler's Testimony

■ Defendant called Erwin Adler to testify as to conversations he had with Lagana in 1985 and 1986. The conversations concerned Adler's handling of the *Wilen* and *Unocal* cases on behalf of First State. In *Unocal*, a superior court ruled that First State was not required to drop down. The content of those conversations, defendant insists, contributed to Lagana's knowledge in 1988 and 1989 when defendant refused to

cover its insureds in this case. Defendant complains that the Court's refusal to allow Adler to discuss the *Unocal* case, on the basis that it did not corroborate Lagana's testimony, was erroneous and requires a new trial. First State argues that despite the fact that Lagana could not recall the *Unocal* case, it does not eliminate the relevance of Adler's testimony. Rather, defendant asserts that the Court should have allowed the testimony and left it to the jury to decide Lagana's state of mind in 1988.

Plaintiffs maintain that the Court properly excluded Adler's testimony concerning the *Unocal* case because Lagana never testified about the *Unocal* case and, thus, the testimony did not corroborate. Plaintiffs also note that defendant disclosed Adler as a witness only three days before he took the stand and only right before taking the stand did First State say that it wanted Adler to testify about *Unocal* to corroborate Lagana's testimony.

In any event, there is no evidence of prejudice in light of the fact that Lagana, neither in his deposition nor at trial, ever remembered the *Unocal* case. The testimony would have been of only speculative relevance at best. This, then, cannot be the basis of a new trial.[2]

### c. *Equitable Subrogation*

Defendant argues that the Court's Order of January 28, 1993 denying First State's claim for equitable subrogation and trial Order denying a right of set-off were reversible error. The Court explored this issue previously and will not revisit the issue now. The Court need not reconsider its previous rulings because defendant fails to raise any new arguments or evidence before the Court.

Accordingly, defendant's motion for a new trial is DENIED.

### B. Defendant's Motion to Alter or Amend the Verdict or for Judgment Notwithstanding the Verdict

Defendant moves to alter or amend the verdict pursuant to Rule 59(e) or for judgment notwithstanding the verdict pursuant to Rule 50(b).

### 1. *Legal Standards*

#### a. *Rule 59(e)*

Rule 59(e) provides a means whereby the Court may alter or amend judgment. *Northern Cheyenne Tribe v. Hodel*, 842 F.2d 224, 227 (9th Cir.1988); *United States v. Western Elec. Co.*, 690 F.Supp. 22, 25 (D.D.C.1988) (Rule 59(e) motion not to be used as vehicle to relitigate matters already disposed of, but simply permits courts to correct errors of fact appearing on the face of the record or errors of law). A Rule 59(e) motion may be based on one of three grounds: (1) Intervening change of controlling law; (2) New evidence not previously available; and (3) A need to correct clear error of law or to prevent manifest injustice. *Atkins v. Marathon LeTourneau Co.*, 130 F.R.D. 625, 626 (S.D.Miss.1990) (citing *Natural Resources Defense Council v. United States Envtl. Protection Agency*, 705 F.Supp. 698, 702 (D.D.C.), *vacated on other grounds*, 707 F.Supp. 3 (D.D.C.1989)). The movant must "clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Western Elec. Co.*, 690 F.Supp. at 25 (quoting *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986)). The decision whether to grant or deny the motion is entrusted to the sound discretion of the district court.

#### b. *Rule 50(b)*

A renewed motion for judgment as a matter of law, also referred to as a motion for judgment notwithstanding the verdict ("JNOV"), is proper to raise when a motion for judgment as a matter of law, otherwise known as a directed verdict, has been denied. Fed.R.Civ.P. 50(b). A Rule 50(b) motion must be preceded by a motion for directed verdict at the close of all evidence. *Air–Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 183 n. 9 (9th Cir.1989), *cert. denied*, 493 U.S. 1058, 110 S.Ct. 868, 107 L.Ed.2d 952 (1990). In addition, the motion must be made on the same grounds as the directed

---

**2.** Moreover, even if there was an error, any error was harmless. *See* Fed.R.Civ.P. 61.

verdict motion. *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir.1990).

] A judgment notwithstanding the verdict is proper if:

> the evidence construed in the light most favorable to the nonmoving party permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's; it is improper if reasonable minds could differ over the verdict.

*Air–Sea Forwarders, Inc. v. Air Asia Co.*, at 181 (quoting *Fleming v. Dep't of Public Safety*, 837 F.2d 401, 408 (9th Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988)). Or, as one court stated, a jury verdict may be set aside if manifest injustice will result if allowed to stand. *See Marley v. City of Allentown*, 774 F.Supp. 343, 344 (E.D.Pa.1991), *aff'd*, 961 F.2d 1567 (3d Cir. 1992).

### 2. *Current Procedural Posture*

] In its June 2, 1993 Order, the Court requested supplemental briefing regarding the Court's authority to consider issues other than punitive damages.[3] The Court was concerned with the scope of its authority to hear arguments pursuant to a Rule 59(e) motion that it otherwise could not entertain under a JNOV motion.

 Upon review, it is apparent that the Court may not consider defendant's Rule 59(e) motion to alter or amend judgment at this time. "A motion to alter or amend the judgment shall be served not later than 10 days *after entry of the judgment.*" Fed. R.Civ.P. 59(e) (emphasis added). In this case, there has been no entry of judgment,

and despite defendant's characterization of the motion as one "to alter or amend the verdict," the Court may not entertain the motion at this stage in the litigation.

In the interest of judicial economy, however, the Court will construe defendant's motion as a Rule 60(b) motion for reconsideration of the Court's January 29, 1993 Order.[4] Absent reconsideration at this stage, defendant would likely refile the Rule 59(e) motion after the entry of judgment. In light of recent case law, and in an effort to conserve judicial resources, the Court will now consider defendant's arguments for reconsideration of the Court's holding that First State had breached its duty to defend, rather than await an identical motion once final judgment has been entered.

### 3. *Legal Standard for Rule 60(b)*

Federal Rule of Civil Procedure 60(b) governs the reconsideration of final orders. That rule permits a district court to relieve a party from a final order or judgment on grounds of:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud ... of an adverse party, ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3), not more than one year after the judgment, order, or proceeding was entered or taken.

Fed.R.Civ.P. 60(b).

 Motions to reconsider are committed to the discretion of the trial court.

---

**3.** As a preliminary matter, First State failed to move for a directed verdict on compensatory damages issues at the close of all evidence. Instead, defendant only moved for a directed verdict after the close of evidence in the first phase on the issue of punitive damages. Thus, the Court may not consider defendant's arguments on any issue other than punitive damages with respect to the JNOV motion. *See Murphy*, 914 F.2d at 186.

As for the punitive damages claim, defendant did raise the issue, but prior to the second phase on punitive damages. Under Rule 50(b), a motion for a directed verdict *"at the close of all the evidence* is a prerequisite for a post-trial motion for JNOV" and this requirement is "to be strictly

observed." *Herrington v. County of Sonoma*, 834 F.2d 1488, 1500 (9th Cir.1987), *cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989). However, the second phase for punitive damages included no evidence, but simply consisted of arguments to the jury. As a result, fortunately for defendant, the motion for directed verdict on punitive damages actually did come at the close of all evidence. Accordingly, the Court can and will consider the Rule 50(b) motion with respect to punitive damages.

**4.** The January 29, 1993 Order, in turn, reconsidered the October 30, 1992 Order, which, in turn, reconsidered the August 13, 1991 Order.

*Combs v. Nick Garin Trucking,* 825 F.2d 437, 441 (D.C.Cir.1987). To succeed in a motion to reconsider, a party must set forth facts or law of a strongly convincing nature to induce the Court to reverse its prior decision. *See, e.g., Kern–Tulare Water Dist. v. City of Bakersfield,* 634 F.Supp. 656, 665 (E.D.Cal.1986), *aff'd in part and rev'd in part on other grounds,* 828 F.2d 514 (9th Cir.1987), *cert. denied,* 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988).

Two arguments are commonly used to justify the reconsideration of an order. Initially, parties often come forth with new evidence. In order for evidence to be considered "new" for the purposes of Rule 60(b), it must meet three standards. First, it must be of such a character that it would change the outcome of the Court's prior decision. *Fernhoff v. Tahoe Regional Planning Agency,* 622 F.Supp. 121, 122 (D.Nev.1985). Second, it must have been undiscovered at the time of Court's original decision. *Engelhard Indus., Inc. v. Research Instrumental Corp.,* 324 F.2d 347, 352 (9th Cir.1963), *cert. denied,* 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964). Third, it could not have been discovered through exercise of reasonable diligence by the moving party. *Shiley, Inc. v. Bentley Lab., Inc.,* 115 F.R.D. 169, 170 (C.D.Cal.1987); *see* Fed.R.Civ.P. 60(b)(2). If the evidence was previously available, the motion fails as a matter of law. *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.,* 813 F.2d 1553, 1557–58 n. 4 (9th Cir. 1987).

The second major ground used to justify reconsideration of an order is a clear error of law by the Court or the need to prevent a "manifest injustice" from occurring. In order for a party to demonstrate clear error, the moving party's arguments cannot be the same as those made earlier. *Backlund v. Barnhart,* 778 F.2d 1386, 1388 (9th Cir.1985). If a party simply inadvertently failed to raise the arguments earlier, the arguments are deemed waived. *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.,* 762 F.2d 557, 561 (7th Cir.1985).

### 4. Analysis

Defendant First State argues that there is no basis for an award of compensatory damages and that the punitive damages award was excessive, unsupported by any evidence, and unconstitutional. As stated above, the Court considers defendant's compensatory damages argument under Rule 60(b) and defendant's punitive damages argument under Rule 50(b).

#### a. Compensatory Damages

Defendant claims that there is no basis for having to pay plaintiffs any compensatory damages. Defendant asserts that recent California Supreme Court and Ninth Circuit decisions have clarified the definition of "unfair competition" so as to preclude a duty to defend owed by defendant. According to defendant, the underlying claim in this action does not contain allegations of "competitive injury" that potentially bring the claim within the coverage for "unfair competition." Defendant argues that, in the least, legal uncertainty as to what "advertising injury" covers extinguishes any duty to defend or indemnify, and that given the uncertain state of the law, First State did not act unreasonably. In sum, defendant contends that the Court erred in its prior Orders, and invites the Court to revisit First State's duty to defend the insureds in the underlying action, which is familiar territory to both the parties and the Court. *See, e.g.,* Court Orders of August 13, 1991, October 30, 1992, and January 29, 1993.

Plaintiffs urge the Court to reject the invitation. In fact, plaintiffs assert that the trial testimony only further solidified the evidence against First State, permitting the jury to conclude that defendant never properly investigated its insured's claim and that defendant has raised no new arguments or evidence. Plaintiffs argue that the underlying action involved a claim for unfair competition, and that, at a minimum, there was a potential for coverage when the claim was tendered to First State. Despite plaintiffs' objections, the Court will once again explore defendant's duty to defend.

### 1) *The Scope of Unfair Competition*

In California, "an insurance company must defend any lawsuit brought against its insured which *potentially* seeks damages within the coverage of the policy." *Mullen v. Glens Falls Ins. Co.*, 73 Cal.App.3d 163, 169, 140 Cal.Rptr. 605 (1977) (citing *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 265, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)) (emphasis in original). Moreover, "coverage clauses are interpreted broadly in favor of coverage." *Kanne v. Connecticut Gen. Life Ins. Co.*, 607 F.Supp. 899, 905 (C.D.Cal.1985), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989).

In the underlying state action, the insureds were sued, inter alia, under a Hawaiian statute encompassing violations of unfair competition and unfair or deceptive business practices. First State's policies provide coverage for "advertising injury," which has been held to encompass claims for unfair competition. *See, e.g., California Shoppers Inc. v. Royal Globe Ins. Co.*, 175 Cal.App.3d 1, 221 Cal. Rptr. 171 (1985). More importantly, the Pacific Employers policy on which the First State excess policy was based specifically defined "advertising injury" to mean "libel, slander, defamation, infringement of copyright, title, or slogan, piracy, *unfair competition*, idea misappropriation, or invasion of rights of privacy, arising out of the insured's advertising activities." *See* Pacific Employers Policy, at "Definitions" (emphasis added); Grimmer Deposition, Ex. 42 (letter of counsel for First State noting that "unfair competition" was specifically encompassed by the Pacific Employers policy definition of "advertising injury").

First State submits that the actual scope of claims for "advertising injury" in relation to claims for unfair competition has been altered or at least clarified in its favor by the recent California Supreme Court decision in *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). *Bank of the West* held that when an insurance policy provides coverage for "damages" caused by "unfair competition," as is the case here, the term "unfair competition" does not encompass claims that might be brought under California's Unfair Business Practices Act, which provides only for restitution, not damages. *Id.* at 1272, 10 Cal. Rptr.2d 538, 833 P.2d 545; *see also* Cal.Bus. & Prof.Code § 17200 *et seq.* (West 1987 & Supp.1993) ("Section 17200"). The California Supreme Court noted that the majority of courts had concluded that the term "unfair competition," as used in policy language defining "advertising injury," refers to the common law tort of unfair competition, for which damages are available. The underlying claims in *Bank of the West* were based on the inadequacy of disclosures to consumers and the illegality of the terms of loans to finance automobile insurance premiums. While the decision in *Bank of the West* dealt with the scope of coverage, rather than the broader duty to defend, it nonetheless defined the scope of "unfair competition" with greater clarity.

The duty to defend a claim allegedly falling within the scope of "unfair competition" was recently discussed in *Standard Fire Ins. Co. v. Peoples Church of Fresno*, 985 F.2d 446 (9th Cir.1993). In determining the scope of coverage, the Ninth Circuit found that within the context of the standard comprehensive general liability ("CGL") policy, "unfair competition" referred only to the common law tort. *Id.* at 450. Advertising injury within that context is "injury inflicted on a competitor and not simply a customer." *Id.* In order to determine whether a potential for coverage exists, the Court must look to the factual allegations in the complaint and to other facts known to the insurer. *Id.* at 451. In other words, the Court must determine whether the facts alleged in the complaint and those known to the insurer indicate sufficient elements of injury to a competitor. Moreover, the duty to defend exists when language in an insurance policy leads the insured to reasonably expect a defense. *Id.*

In *Standard Fire*, the underlying action stemmed from a failed plan to build a residential development financed through development bonds issued by the City of Fresno. When the project failed, the bondholders sued developer Peoples Church for negligently misrepresenting the viability of the project to investors. As in *Bank of the West*,

the claim was brought under Section 17200, and therefore plaintiffs could seek only restitutionary relief. The Ninth Circuit concurred with the California Supreme Court's *Bank of the West* decision in finding that restitutionary relief did not constitute "damages" within the meaning of a CGL policy. The court found that there was no possible means of bringing plaintiffs' claim within the definition of the common law tort of unfair competition because there was no competitive injury.

More recently, the Ninth Circuit appeared to acknowledge some uncertainty as to whether *Bank of the West* explicitly confined coverage under "unfair competition" to the common law tort. *See Keating v. Nat'l Union Fire Ins. Co.*, 995 F.2d 154 (9th Cir.1993). In *Keating,* plaintiff investors contended that the underlying securities fraud and related claims were covered under the "unfair competition" provision in National Union's policy. Again, plaintiffs sued under Section 17200 of California's Unfair Business Practices Act. The court noted the plaintiff's suggestion that *Bank of the West* did not exclusively confine "unfair competition" coverage to the common law tort. The court responded that, "[w]hether the California Court would restrict liability under such policies to the exact confines of the common-law tort of unfair competition is not crucial in this case." *Id.* at 155. As plaintiffs brought their claims under Section 17200, the court found that *Bank of the West* left no doubt that the investors' claims did not qualify as "damages" from "advertising injury" caused by "unfair competition." *Id.* The court held that in order to be covered under an "unfair competition" provision, *"[s]ome* substantial component of competitive injury is required." *Id.* (emphasis in original).

Upon consideration of these recent decisions by the California Supreme Court and by the Ninth Circuit, the Court, for the reasons articulated below, finds no clear error of law and thus upholds its prior conclusion on the duty to defend.[5]

2) *Hawaii's Unfair or Deceptive Business Practices Statute*

■ Initially, there is an important distinction between California's Unfair Business Practices Act and the Hawaii statute sued upon in this action. As in California, Hawaii's statutory scheme provides a cause of action for "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Haw. Rev.Stat. § 480–2(a). In contrast to the California statute, however, the Hawaii statute contains a blanket provision authorizing private actions for *damages* sustained under any provision of the chapter. *Paulson, Inc. v. Bromar, Inc.,* 775 F.Supp. 1329, 1337 (D.Haw.1991); Haw.Rev.Stat. § 480–13(a). Under the damage provision, a successful plaintiff is entitled to the greater sum of either $1,000 or treble damages. Haw.Rev. Stat. § 480–13(a). Significantly, these damages are available whether a plaintiff sues for unfair competition or for unfair or deceptive business practices. *Paulson,* 775 F.Supp. at 1338.

The instant case is distinguishable from *Bank of the West, Standard Fire,* and *Keating* because unlike those cases, the underlying action in this case was brought under a statute that actually provides for damages. Damages are available for the common law tort of unfair competition. *See Bank of the West,* 2 Cal. 4th at 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545. Further, damages are a prerequisite to a claim under the Pacific Employers Policy. As in *Bank of the West,*

**5.** Defendant's reliance on *Dykstra v. Foremost Ins. Co.,* 14 Cal.App. 4th 361, 17 Cal.Rptr.2d 543 (1993), is misplaced. In *Dykstra,* the policies at issue defined a covered occurrence as an "accident ... neither expected nor intended from the standpoint of the insured." The court found that the language of the policy precluded coverage for losses based on the insured's misrepresentation of his son's business skills and experience because the misrepresentations were intentional, rather than "accidental." The language, and therefore the coverage, of the policy in the instant case is different from that in *Dykstra,* and the holding in that case is thus unhelpful.

Similarly, defendant's citation of *Chamberlain v. Allstate Ins. Co.,* 931 F.2d 1361 (9th Cir.1991), does not advance its cause or alter the Court's decision. The *Chamberlain* court reviewed a policy that covered "accidental loss," not intentional acts. The insured was sued only for intentional acts and, as a result, no potential for coverage existed. Here, however, a potential for coverage does exist.

*Standard Fire,* and *Keating,* the underlying policy in this case provided coverage for "damages" sustained from "unfair competition." Unlike those cases, the statutory claim in this action in fact provided a private damages remedy.

### 3) *Factual Allegations of Unfair Competition in the Underlying Complaint*

Aside from the differences between California and Hawaii law, the underlying action in this case contains sufficient elements of competitive injury to potentially fall within coverage [6] under the recently enunciated standards of the California Supreme Court and the Ninth Circuit. In making this determination, the Court looks beyond the four corners of the complaint and considers the essence of the allegations in the underlying complaint as well as those facts known to the insurer. Defendant correctly asserts that The Pacific Group's original claim was for deceptive business practices, rather than for unfair competition. However, the facts alleged in the complaint along with those known to the insurer indicate sufficient components of competitive injury.

The facts of this case reveal that The Pacific Group and U.S. Hotels do *not fall* neatly into either the "competitor" or the "consumer" category. In the cross-claim filed by The Pacific Group in October 1986 ("Cross-claim"), The Pacific Group alleged that it: (1) Lost a business opportunity "to obtain alternative financing"; (2) "suffered damage to its business reputation"; (3) "lost more than 900,000 in deposits, franchise fees and other out-of-pocket expenses"; and (4) "lost more than $2 million in profits it reasonably expected to enjoy from the purchase and operation of the Kona Lagoon Hotel." Cross-claim, at ¶ 36. The Pacific Group also contended in the underlying action that:

> US Hotels attempted, by trickery and misrepresentation, to worsen the plight of an ailing hotel, thereby forcing its owners to accept a bargain-basement offer. US Hotels never did obtain the hotel as they had planned. But they risked nothing at all of their own. Only the seller's considerable equity, the Pacific Group's million dollar

investment, and the Pacific Group's business reputation were at stake. And all of that was lost as a result of US Hotel's cutthroat business practices.

The Pacific Group's Opposition to U.S. Hotels' Motion for Partial Summary Judgment, Nov. 5, 1987, at 11.

The Pacific Group characterized the claim by alleging that the insureds manipulated a business relationship with a series of unfair acts so that U.S. Hotels could ultimately seize The Pacific Group's opportunity to buy and refurbish the Kona Lagoon Hotel. In other words, U.S. Hotels unfairly competed with The Pacific Group.

The Court recognizes that The Pacific Group and U.S. Hotels are not the typical direct competitors bringing a claim for unfair competition. However, The Pacific Group did allege "[s]ome substantial component of competitive injury," and its claim, therefore, falls with the scope of potential coverage. *See Keating,* 995 F.2d at 155 (emphasis in original). Even though The Pacific Group is not an ordinary competitor, it is also not an ordinary consumer. The relationship between The Pacific Group and U.S. Hotels is significantly different from the relationships in *Bank of the West, Standard Fire,* and *Keating.* In *Bank of the West,* the relevant relationship was that between consumers and their bank; in *Standard Fire,* the action was brought by bondholders against a city-financed developer; and in *Keating,* investors brought the underlying claims for securities fraud and related claims. In all three cases, the plaintiffs could be characterized as deceived consumers.

In this case, the plaintiffs cannot be so characterized. As investors, The Pacific Group and U.S. Hotels were potential competitors in the business marketplace. Despite a temporary partnership, U.S. Hotels allegedly caused The Pacific Group to lose an investment deal potentially worth millions of dollars. Allegedly, the loss partially resulted from misrepresentations in advertising literature—pamphlets that distorted the management division's staffing, management talents, and ability to secure the hotel purchase.

---

**6.** *Cf. Chamberlain,* 931 F.2d at 1364 (no potential for coverage).

The Pacific Group was undoubtedly injured, and in light of its allegations of intentional and deceitful conduct by U.S. Hotels, it is certainly possible to characterize this injury as one motivated by competitive interests.

#### 4) *First State's Conduct Supports the Finding of a Duty to Defend*

The conduct and beliefs of First State at the time tender was made further support the conclusion that it was obligated to defend its insureds. First State's conduct in prodding Pacific Employers to take up the defense indicates that there was, at least in First State's considered view, a clear possibility that the claims fell within the Pacific Employers policy. As described in the August 1991 Order, in an April 6, 1989 letter from First State's counsel, Gary Grimmer, to David Smith, Senior Claims Supervisor for Pacific Employers, First State through Grimmer expressly stated as follows:

> I note that your policy does provide an obligation to defend. And, although the duty to indemnify any loss for the unfair and deceptive trade practice or unfair methods of competition claim brought in the suit is less clear, I believe there is substantial authority that Pacific Employers should be providing a defense
>
> . . . .
>
> ... [I]t is clear that claimant[']s complaint and pretrial statement have set forth a cognizable claim for unfair competition. Your policy's definition of advertising injury specifically includes unfair competition. California Courts have held advertising activities to include oral misrepresentations made on a one-to-one basis. [Citations omitted.]

*See* Grimmer Deposition, Ex. 42.

As the First State excess policy adopted the terms of the underlying primary policy, then, it follows, the underlying claims also would be covered by First State's policy. First State concedes as much in its own briefs on this matter. *See* Memorandum in Support of First State's Motion for Summary Judgment, 15:12–14 ("[A]ny duty to defend on behalf of First State would be the same as the duty provided in the Pacific Employers' policy"). Indeed, First State's own letter from its counsel, Gary Grimmer, to Vice–President Frank Lagana stating that "First State might have a duty to defend" in the event Pacific Employers failed to take up the defense further supports a finding that First State believed that the claims possibly fell within the terms of its policy with the insureds. *See* Strange Declaration, Jul. 3, 1991, Ex. A. This conclusion was also repeated in the deposition testimony of Mr. Lagana himself. *See* Lagana Deposition, 24:16–17, 60:8–10, 83:16–18 & Ex. 78 (confirming that "[t]he policy applied. The coverage applied"; identifying Lagana's handwritten memo that "[i]t appears that plaintiffs['] unfair compet[it]ion allegations would be covered by underlying 'advertising injury' coverage"; and stating that "First State never took the position that coverage did not apply").

The evidence indicates that defendant, in reliance on relevant legal authority, correctly believed that the claims potentially fell within the underlying Pacific Employers' policy, and hence, through to the excess insurance policy issued by First State.

#### 5) *Summary*

While recent case law has defined "unfair competition" more narrowly and with greater specificity, the latest decisions by the Ninth Circuit and California Supreme Court do not relieve defendant of the duty to defend. First, the case at hand is significantly different than those decisions because the underlying claim in this action was brought under a Hawaii statute providing a damages remedy. Second, there are sufficient allegations of competitive injury in the underlying claim to state a claim potentially falling within the scope of "unfair competition." Finally, the conduct of First State indicates that defendant believed the claim potentially fell within the scope of coverage.

Defendant First State has failed to establish, let alone clearly establish, either a clear error of law or fact. Therefore the Court reaffirms, as a matter of law, that the claims against the insureds in the underlying state action potentially fell within the coverage of the First State policy at the time defendant refused to defend. Accordingly, defendant's

motion to reconsider the Court's prior ruling on compensatory damages is DENIED.

### b. *Punitive Damages Award*

Defendant argues that the jury's award of $21 million in punitive damages is unsupported by the evidence, is unconstitutional, and must be overturned as a matter of law. As discussed above, defendant's motion to alter or amend the verdict is premature, but the Court will examine punitive damages with respect to First State's motion for judgment notwithstanding the verdict.

### 1) *Legal Standard*

Plaintiffs pursued punitive damages under California Civil Code section 3294. As a result, the Court must look to California law regarding the propriety of a punitive damages award.

Punitive damages are properly awarded to punish wrongdoers and deter others from committing future wrongful acts. *Adams v. Murakami,* 54 Cal.3d 105, 110, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991); *Las Palmas Assocs. v. Las Palmas Center Assocs.,* 235 Cal.App.3d 1220, 1243, 1 Cal. Rptr.2d 301 (1991). They are not to be awarded on the basis of jury passion or prejudice, and the Court must overturn them if it appears that the punitive damages were the product of such improper motives. *Harmsen v. Smith,* 693 F.2d 932, 947 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Glovatorium, Inc. v. NCR Corp.,* 684 F.2d 658, 663 (9th Cir.1982); *Neal v. Farmers' Ins. Exch.,* 21 Cal.3d 910, 928, 148 Cal.Rptr. 389, 582 P.2d 980 (1978); *Rosener v. Sears, Roebuck & Co.,* 110 Cal.App.3d 740, 749–50, 168 Cal.Rptr. 237 (1980).

The Court must look to three factors to determine whether the jury's punitive damages award was the product of passion or prejudice. First, the Court must be satisfied that there was evidence indicating that the defendant acted in a sufficiently reprehensible way to justify the award of punitive damages. *See Las Palmas Assocs.,* 235 Cal. App.3d at 1243–44, 1 Cal.Rptr.2d 301; *Rosener,* 110 Cal.App.3d at 751, 168 Cal.Rptr.

237 (citing *Neal,* 21 Cal.3d at 928, 148 Cal. Rptr. 389, 582 P.2d 980).

Second, there must be a reasonable relationship between the punitive damages award and the defendant's financial status. Just as a large punitive damages award may be needed to punish and deter a wealthy defendant, a smaller award is appropriate for a less wealthy defendant. The Court must determine whether the jury's punitive damages award is so disproportionately high compared to the defendant's financial status that it must be the result of jury passion or prejudice. *See Neal,* 21 Cal.3d at 928, 148 Cal.Rptr. 389, 582 P.2d 980 ("[T]he function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter").

A necessary prerequisite to such a determination is the presence of "meaningful evidence" in the record of the defendant's financial status. *Adams,* 54 Cal.App.3d at 109, 284 Cal.Rptr. 318, 813 P.2d 1348. Such evidence is meaningful if it permits the jury and the Court to compare the amount of punitive damages to the defendant's financial status—the Court must be able to determine whether the award is properly proportional to the defendant's wealth. *See Las Palmas Assocs.,* 235 Cal.App.3d at 1243, 1 Cal. Rptr.2d 301 ("Obviously, the trier of fact cannot measure the 'punishment' without knowledge of defendant's ability to respond to a given award") (quoting *Coy v. Superior Court,* 58 Cal.2d 210, 222–23, 23 Cal.Rptr. 393, 373 P.2d 457 (1962)).

Accordingly, there must be evidence which permits the jury to do more than speculate about the defendant's financial resources—there must be evidence of the defendant's net worth or evidence of the profitability of the defendant's wrongful conduct. *See Adams,* 54 Cal.3d at 116 n. 7, 284 Cal.Rptr. 318, 813 P.2d 1348 (noting the two measures but not deciding which measure is preferred); *Little v. Stuyvesant Life Ins. Co.,* 67 Cal.App.3d 451, 469 & n. 5, 136 Cal.Rptr. 653 (1977) (evidence of gross assets or gross income is insufficient; there must be

evidence of net assets or net income). The plaintiff has the burden of establishing the defendant's financial status. *Adams,* 54 Cal.3d at 109, 284 Cal.Rptr. 318, 813 P.2d 1348.

■ The third requirement for punitive damages is that the award must bear some reasonable relationship to the amount of compensatory damages awarded by the jury. *See Harmsen,* 693 F.2d at 947; *Biundo v. Old Equity Life Ins. Co.,* 662 F.2d 1297, 1300 (9th Cir.1981); *Adams,* 54 Cal.3d at 111, 284 Cal.Rptr. 318, 813 P.2d 1348; *Las Palmas Assocs.,* 235 Cal.App.3d at 1243–44, 1 Cal. Rptr.2d 301. Although there is no fixed ratio of punitive to compensatory damages by which the Court may evaluate the award, "even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small." *Neal,* 21 Cal.3d at 928, 148 Cal.Rptr. 389, 582 P.2d 980; *see also Rosener,* 110 Cal.App.3d at 751, 168 Cal.Rptr. 237.

The Court must be certain that the punitive damages award meets all three of these requirements. *See Adams,* 54 Cal.3d at 111, 284 Cal.Rptr. 318, 813 P.2d 1348. If the award satisfies all three requirements, then the jury's decision on punitive damages must be upheld.

### 2) *Application*

■ The punitive damages award in this case is unsupported by the evidence and must be overturned as a matter of law. Specifically, the Court finds that the award is not supported by evidence of malice, fraud, or oppression.

### a) *Evidence of Reprehensibility*

[43] To be entitled to punitive damages, plaintiffs must demonstrate by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. Cal. Civ.Code § 3294. "Clear and convincing evidence" consists of evidence "so clear as to leave no substantial doubt" and "sufficiently strong to command the unhesitating assent of every reasonable mind." *In re Angela P.,* 28 Cal.3d 908, 919, 171 Cal.Rptr. 637, 623 P.2d 198 (1981). Simply the denial of bene-

fits in itself does not demonstrate bad faith which could provide the requisite reprehensibility warranting punitive damages. *See Hanson v. Prudential Ins. Co.,* 783 F.2d 762, 766 (9th Cir.1985).

■ Under this high standard, plaintiffs must prove that defendant acted "with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights." *Austero v. Washington Nat'l Ins. Co.,* 132 Cal.App.3d 408, 418, 182 Cal.Rptr. 919 (1982) (quoting *Silberg v. California Life Ins. Co.,* 11 Cal.3d 452, 462, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974)). Hence, courts have vacated punitive damages awards as unsupported by substantial evidence even where the record contained evidence that the insurer acted unreasonably or in bad faith. *See, e.g., Beck v. State Farm Mut. Automobile Ins. Co.,* 54 Cal.App.3d 347, 355–56, 126 Cal.Rptr. 602 (1976).

This case highlights a dispute about insurance coverage. Despite evidence of defendant's failure to properly investigate its insured's claim, no direct evidence of malice, fraud, or oppression can be found, or has been identified, in the record. The evidence demonstrates that defendant elected not to defend its insureds, not for reasons rooted in malice or oppression, but because it believed, erroneously, that it was not required to drop down and defend.

Plaintiffs raised no evidence of actual malice or oppression. Rather, the jury heard evidence that the insureds' counsel sent a letter to defendant's counsel, Gary Grimmer, saying that a defense was required if the underlying carriers refused. Trial Ex. P36. Grimmer notified Frank Lagana that "First State might be liable to the insured, but should obtain indemnity or contribution from Pacific Employers." Trial Ex. P88. Plaintiffs argue that because Grimmer thought the claim was covered, First State's decision to ignore its counsel demonstrates conscious disregard of its insureds' rights. This view is incorrect. The evidence presented simply shows that Lagana believed, wrongly as it turned out, that First State had no duty to drop down and defend.

**█] ** Certainly plaintiffs have raised evidence that First State embraced an unreasonable position. Plaintiffs have also presented evidence that First State unreasonably refused to settle the underlying action. However, unreasonableness does not in itself justify punitive damages. Although the plaintiffs have, at least in the jury's view, sufficient evidence to establish First State's bad faith, they have adduced no actual evidence of defendant's intent to vex, injure, or consciously disregard its insureds rights. *See Austero*, 132 Cal.App.3d at 418, 182 Cal. Rptr. 919. And an insurer's bad faith does not in itself establish the requisite intent to injure for punitive damages. *See Beck*, 54 Cal.App.3d at 355, 126 Cal.Rptr. 602. Faced with arguable uncertainty as to applicable California law, defendant decided not to defend its insureds. This, however, does not establish First State's intent to consciously disregard plaintiffs' rights.

When construing the evidence in the best light for the plaintiffs, the Court concludes that no reasonable or rational jury could have found evidence of malice, fraud, or oppression to justify the imposition of punitive damages. Indeed, the Court finds that the $21 million in punitives was imposed on the basis of passion and prejudice and to uphold the verdict would only result in manifest injustice to the defendant. Accordingly, the Court GRANTS defendant's motion to vacate the punitive damages award in its entirety.[7]

### b) *Defendant's Financial Condition*

**█** Defendant also argues that the punitive damages award fails the second requirement because it bears no reasonable relationship to First State's financial status.[8] As noted above, the California Supreme Court in *Adams* identified two possible measures of a defendant's financial status—net worth or net profits gained as a result of the wrongful activity. *Adams*, 54 Cal.3d at 116 n. 7, 284

Cal.Rptr. 318, 813 P.2d 1348 (though the court refused to endorse any particular method). However, because the Court has already determined the award to be unjustified, this factor need not be reviewed, although the Court would consider the award of $21 million in punitive damages excessive in relation to defendant's net worth. Such an award would ruin the defendant.

### c) *Relation to Harm Suffered by Plaintiffs*

**█** Finally, even if the punitive damages award in this case were able to pass the first and second tests, defendant claims that it clearly fails the third test that it be reasonably related to amount of compensatory damages awarded to plaintiff. The jury was not responsible for awarding compensatory damages. Instead, the parties agreed that the Court would determine compensatory damages after the trial. As a result, the Court instructed the jury that they should consider plaintiffs' compensatory damages to be $4.8 million. The ratio of the $21 million punitive damages award to these actual damages is over 4 to 1.

California decisions on punitive damages would suggest that such a proportion of punitive to actual damages is not excessive as a matter of law. For example, in *Little*, 67 Cal.App.3d at 470, 136 Cal.Rptr. 653, the court found that a ratio of 14 to 1 was excessive. In *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979), *cert. denied*, 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980), the California Supreme Court held that a ratio of 40 to 1 was excessive. Finally, the court in *Rosener*, 110 Cal.App.3d at 752, 168 Cal. Rptr. 237, found that a ratio of 63 to 1 was excessive. Yet other courts have found ratios higher than 4 to 1 to be appropriate. *See, e.g., Moore v. Am. United Life Ins. Co.*, 150 Cal.App.3d 610, 197 Cal.Rptr. 878 (1984);

---

**7.** As defendant's motion to vacate the punitive damages award is granted, the Court need not resolve the interesting, but disputed, issue regarding the availability of a lien on the recovery of punitive damages.

**8.** The jury was informed that First State's net worth, as indicated on a financial statement, was $62,360,112. The punitive damages award, therefore, was approximately one-third of defen-

dant's net worth. Defendant argues that the net worth figure was not firm and that plaintiffs' counsel argued a net worth of one billion dollars. Plaintiffs claim that the Court did not limit net worth to $62 million, but left it to the jury to decide what was an appropriate figure for net worth. *See* U.S. Hotel Plaintiffs' Opposition, Apr. 15, 1993, at 24.

*Miller v. Elite Ins. Co.,* 100 Cal.App.3d 739, 161 Cal.Rptr. 322 (1980); *Zhadan v. Downtown Los Angeles Motor Distributors, Inc.,* 100 Cal.App.3d 821, 161 Cal.Rptr. 225 (1979).[9]

Defendant's main contention, however, appears to be that the jury was not instructed as to the *actual* compensatory damages. First State insists that if it must pay more than $4.8 million, the jury may have awarded less punitives because it would have believed the overall monetary burden was sufficiently punitive. On the other hand, defendant complains that if it will pay less than $4.8 million, the instruction was also erroneous because the jury might have used the lower figure to compute a smaller punitive award.

First State's argument is unpersuasive. The Court specifically instructed the jury to consider a compensatory award of $4.8 million in reaching a decision on punitive damages. Speculation as to what the jury might have decided in light of the actual compensatory damages awarded comes too late. Defendant agreed that the Court should determine compensatory damages and agreed that the Court would make the determination *after* the jury had concluded its deliberations and reached its verdict.

Finally, defendant's argument that the jury might have included a compensatory award in the punitive damages award is idle conjecture. The Court, through its note to the jury, stated that the jury was not responsible for awarding any non-punitive damages. Thus, the Court finds that the ratio of 4 to 1 is not excessive.

### 3) *Summary*

Punitive damages awards must have a reasonable relationship to a defendant's conduct, financial resources, and the actual damage caused to plaintiff. The award in this case has no reasonable relationship to the first factor. The only inference that can be drawn from an analysis of the punitive damages award is that it was a result of passion and prejudice on the part of the jurors. Accordingly, the Court GRANTS First State's motion for judgment as a matter of law and VACATES the punitive damages award.[10]

### C. Entry of Judgment and Compensatory Damages

Plaintiffs seek entry of judgment on their compensatory damages. The parties agreed that the Court would determine the appropriate compensatory award. The Court previously expressed its position that the settlements received from the other insurers would be deducted from plaintiffs' damages claim and plaintiffs have submitted a damage claim reflecting this deduction.

The U.S. Hotel plaintiffs have submitted a proposed judgment which requests compensatory damages in the amount of $8,306,792.80. This amount is derived from the underlying judgment of $7,840,675.51 entered against U.S. Hotels on December 8, 1989. Plaintiffs received the first settlement of $850,000 at this time. The uncompensated principal of $6,990,675.51 remained unchanged until April 16, 1990 when another $662,500 (net) settlement was received. The interest, plaintiffs argue, from December 8,

**9.** The recent Supreme Court decision, *TXO Production Corp. v. Alliance Resources Corp.,* — U.S. —, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), does not help defendant's position on this factor. In *TXO,* the Court upheld a $10 million punitive damages award when the actual damages were only $19,000.

In addition, because the punitive damages award is now vacated, the Court need not address the argument that the punitive damages award in this case violates First State's due process rights. In light of *TXO,* however, this argument would appear doomed.

**10.** If the Court has granted a post-trial motion for judgment as a matter of law, Federal Rules of Civil Procedure 50(c)(1) requires the Court to conditionally rule on a motion for a new trial. Under the Federal Rules, the Court may grant a new trial for any reason which suggests that the jury's verdict was clearly wrong or was a miscarriage of justice. *See* Fed.R.Civ.P. 59(a).

The Court CONDITIONALLY GRANTS First State's motion for a new trial on punitive damages. The Court has already ruled that the jury's punitive damages award is unsupported by the evidence. Having sat through the entire trial, the Court finds that the jury's award of $21 million was not warranted by the evidence before it. The jury clearly made an error which has resulted in a miscarriage of justice. Accordingly, if the Court's judgment as a matter of law is overturned on appeal, the Court finds that a new trial on punitive damages is necessary.

1989 through April 16, 1990 comes to $260,474.47, using a ten percent interest rate pursuant to California Civil Code section 3289(b). Defendant has not objected to this rate. The principal as of April 16, 1990 was thus $6,328,175.51. With a simple interest rate of ten percent, the interest from April 16, 1990 through February 1, 1993 is $1,718,142.90. This results in a combined principal and interest of $8,306,792.80.

Defendant has four primary objections to compensatory damages—none of which survive scrutiny.

### 1. Unexhausted Underlying Coverage

■ Defendant argues that it need not pay any compensatory damages because there still remains sufficient unexhausted insurance coverage from the underlying carriers to cover the entire verdict. In particular, First State claims that the total unexhausted coverage from all underlying carriers is $8.32 million, which is enough to cover the verdict. See Defendant's Opposition to Compensatory Damages, Mar. 25, 1993, at 1–2.

Put another way, First State argues that justice demands that the underlying limits be applied. Defendant requests that, if forced to pay some compensatory damages, it only pay damages within its layer of coverage, not any unpaid amounts from the layers of the underlying insurers. Defendant asserts that enforcing its drop down obligation does not include it bearing financial responsibility for the underlying carriers.

■ Defendant's position sounds strikingly similar to a form of equitable subrogation, which the Court found to be unavailable to defendant in its January 28, 1993 Order and which the Court elects not to reconsider now. In general, equitable subrogation is applied to avoid unjust enrichment when one party has discharged an obligation which should have been satisfied by another. Hocker, 922 F.2d at 1485. However, the person asserting the right to equitable subrogation must be without fault. Id. In this case, the Court has already determined that First State has "unclean hands" and therefore may not assert the right of equitable subrogation. Moreover, under defendant's

theory, the breaching insurance company would gain the full benefit of other insurance policy limits regardless of whether the insured ever receives payments from them or not.

Defendant is liable for the entire amount of damages proximately caused by its breach of the duty to defend. "[D]amages for breach of duty to defend are not inexorably imprisoned within the policy limit but are measured by the consequences proximately caused by the breach." State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co., 9 Cal. App.3d 508, 529, 88 Cal.Rptr. 246 (1970) (citing Comunale v. Traders & General Ins. Co., 50 Cal.2d 654, 660, 328 P.2d 198 (1958)). Here, defendant's failure to defend, coupled with its failure to settle, renders it liable for the entire judgment. See Samson v. Transamerica Ins. Co., 30 Cal.3d 220, 237, 178 Cal.Rptr. 343, 636 P.2d 32 (1981). While First State would ordinarily be entitled to seek indemnification against the primary insurers, its own wrongful conduct has precluded that course of action in this case.

### 2. Reduction by U.S. Hotels' Share of the Recovery

■ Defendant raises the issue of whether the fact that the U.S. Hotels received twenty percent of the judgment against it pursuant to the settlement agreement entered into between The Pacific Group and U.S. Hotels should reduce the amount of compensatory damages.

Defendant argues that judgment should be reduced by the $1.5 million which U.S. Hotels claims it is entitled to under the settlement between The Pacific Group and U.S. Hotels. First State insists that the 1989 agreement constituted collusive maneuvering or that plaintiffs sacrificed a portion of the judgment to obtain a stipulation to liability and an assignment of rights. If the Court does not reduce the compensatory damage award by $1.5 million, defendant argues that the Court would then condone such agreements which motivate insureds to inflate damages in actions brought against them.

Plaintiffs argue that the agreement was entered into when no carrier would defend U.S. Hotels in the underlying action and the

plaintiffs agreed to the best deal they could find. Moreover, the U.S. Hotel plaintiffs note that the settlement required them to forfeit eighty percent of their emotional distress and punitive damages claims in the negotiation with The Pacific Group. Finally, plaintiffs argue that the settlement should not alter the amount that the plaintiffs were "damaged" in terms of reducing compensatory damages and that they should not be penalized for the settlement.

 It is true that an insurance contract imposes a duty of good faith and fair dealing on the insured as well as the insurer. *Samson,* 30 Cal.3d at 240, 178 Cal.Rptr. 343, 636 P.2d 32 (citing *Johansen v. California State Auto. Assn. Inter–Ins. Bureau,* 15 Cal.3d 9, 20, 123 Cal.Rptr. 288, 538 P.2d 744 (1975)). However, where an insurer has breached its duty to defend, the insured may, in the absence of fraud or collusion, and without forfeiture of the right to indemnity, settle with the plaintiff on the best terms possible, taking a covenant not to execute. *Id.* Here, if The Pacific Group had taken 100% of U.S. Hotels' assignable contract claims and left the U.S. Hotels with 100% of its non-assignable emotional distress and punitive damages claims, there would be little question that The Pacific Group would receive the full value of the contract claim. Defendant has mustered no showing of fraud or collusion between The Pacific Group and U.S. Hotels, and thus there is no justification for reducing plaintiffs' judgment as a result of an agreement which was brought about by defendant's failure to defend.

### 3. *Plaintiffs' Burden to Establish Coverage*

 Next, defendant maintains that it is not bound by the stipulated judgment until plaintiffs prove that the claim stipulated to is, in fact, covered. Defendant argues that while it may have had a duty to drop down and defend, it had no concurrent duty to drop down and settle. Accordingly, defendant argues, it cannot be accused of a "failure to settle," and its damages cannot exceed First State's policy limits.

 As plaintiffs correctly assert, an insurer's failure to defend, coupled with its failure to settle, renders it liable for the entire judgment. *See Samson,* 30 Cal.3d at 237, 178 Cal.Rptr. 343, 636 P.2d 32. Further, "[a]n insurer denies coverage at its own risk and, although its action may not have been entirely groundless, it is liable for all of the detriment caused by its breach." *State Farm v. Allstate,* 9 Cal.App.3d at 530, 88 Cal.Rptr. 246; *see also Comunale,* 50 Cal.2d at 660, 328 P.2d 198.

 The Court recognizes that in *Samson* and *State Farm v. Allstate,* the facts were notably different from the instant case. Neither case involved an excess insurer and in both cases coverage was found. However, the salient principle in both cases applies with equal force to the case at hand—namely, that an insurer may be exposed to excess liability when it refuses to defend and fails to accept a reasonable settlement offer.

In this case, the jury, by its verdict, found that First State's failure to defend proximately caused the settlement and judgment in the underlying Hawaii lawsuit. Moreover, First State admits that it failed to settle the claim for $1.3 million. First State argues, however, that its duty to accept a reasonable settlement offer did not drop down with its duty to defend. Thus, First State argues that the $1.3 million offer was within Pacific Employers' layer, rather than First State's layer.

Defendant's argument is unpersuasive because the Court's earlier finding of First State's duty to drop down carried with it the responsibility to consider settlement offers and accept them if reasonable. Because it breached its contractual duty to defend and failed to accept a reasonable settlement offer, First State is now liable for all of the damages flowing from its conduct.[11]

11. Defendant cites *State Farm Mut. Auto. Ins. Co. v. Superior Court,* 211 Cal.App.3d 5, 15 n. 11, 259 Cal.Rptr. 50 (1989), for the proposition that when an insurer has refused to defend, the "insured is free to agree with the claimant to a judgment resolving the issue of his liability which, *if coverage is subsequently established,* would constitute a final judicial determination of that liability binding upon the insurer even though it was not a party to the action or to the

#### 4. Conduct of U.S. Hotels

■ First State argues that the conduct of the insureds caused the actual harm that they have suffered. Defendant claims that U.S. Hotels settled for twenty cents on the dollar despite unexhausted layers of coverage in excess of $7.5 million and that the settlement was not in good faith. First State argues that justice requires a reduction.

However, U.S. ·Hotels settled with other insurance companies to reduce the amount of harm as it reduced the money for which they were liable. First State's argument that its insureds settled "too cheap" rings hollow. "[W]here the insurer has repudiated its obligation to defend[,] a defendant in the absence of fraud may, without forfeiture of his right to indemnity, settle with the plaintiff upon the best terms possible, taking a covenant not to execute." *Samson*, 30 Cal.3d at 240, 178 Cal.Rptr. 343, 636 P.2d 32 (quoting *Zander v. Texaco, Inc.*, 259 Cal.App.2d 793, 802, 66 Cal.Rptr. 561 (1968)). Defendant passed on the opportunity to settle the case for $1.3 million and now must suffer the consequences of compensatory damages.

■ Defendant's final assertion is that the U.S. Hotels have failed in their duty to mitigate their losses by failing to obtain "reasonable" settlements from the underlying carriers. However, "neither a coinsurer nor the plaintiffs in a suit against an insured defendant have a duty to the insurer, in the absence of any positive steps that might lead the insurer to expect notice from them."

*Samson*, 30 Cal.3d at 241, 178 Cal.Rptr. 343, 636 P.2d 32 (citing *Drinnon v. Oliver*, 24 Cal.App.3d 571, 581–583, 101 Cal.Rptr. 120 (1972)). Here, no such "positive steps" were undertaken, and accordingly, plaintiffs were under no duty to First State absent general obligations of good faith. Nonetheless, the fact that U.S. Hotels settled with the other insurers for less than the policy limits is not "unreasonable" in light of their own need to reduce their liability in the absence of a defense.

Accordingly, as none of defendant's objections have merit, the Court GRANTS plaintiffs' motion for entry of the proposed compensatory damages judgment.

#### D. Attorneys' Fees

The U.S. Hotel plaintiffs have also moved for attorneys' fees for both the fees incurred in prosecuting this action and the non-reimbursed attorneys' fees incurred in the underlying action.

#### 1. Legal Standard

■ The so-called "American Rule" dictates that parties to litigation bear their own attorneys' fees. However, plaintiffs rely on the California Supreme Court case *Brandt v. Superior Court*, 37 Cal.3d 813, 817, 210 Cal. Rptr. 211, 693 P.2d 796 (1985), which held that "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be

---

agreement" (emphasis in original). Defendant interprets this case as holding that an insurer may only be held liable for damages exceeding the policy limits if coverage is subsequently established. Defendant has misread this case.

In *State Farm v. Superior Court*, the issue was whether an award entered pursuant to a judicial arbitration proceeding under California Code of Civil Procedure § 1141.23 constituted a "conclusive judicial determination" of the insureds' liability for purposes of plaintiffs' standing to bring a subsequent third party bad faith action against the insurer. The court held that "the issue of liability is necessarily resolved by the agreed judgment *unless* it has been the product of fraud or collusion or the insurer was denied the opportunity to participate in and defend the action against its insured." *Id.* at 15, 259 Cal.Rptr. 50 (emphasis in original). The court then noted that insurer participation was not necessary

where there had been a denial of coverage or refusal to defend.

The focus of *State Farm v. Superior Court* was on the integrity of a judicial arbitration proceeding for the purposes of the insureds' liability. That is not the issue in this case. As the court there stated, "[h]ere, the *only* issue with which we are concerned is whether State Farm's insureds had *any* liability to the claimant seeking to prosecute the bad faith action." *Id.* at 14, 259 Cal.Rptr. 50 (emphasis in original).

In this case the validity of U.S. Hotels' stipulation to liability is not in question. Moreover, the U.S. Hotel plaintiffs stipulated only to liability, and not a final judgment on damages. In fact, U.S. Hotels continued to request a defense in the damages trial, and continued to be denied. As a result, *State Farm v. Superior Court* fails to advance defendant's position.

held liable in a tort action for that expense." Still, fees incurred in establishing extra-contractual damages are not compensable. As for allocation between the two, the *Brandt* court stated that:

> the determination of recoverable fees must be made by the trier of fact unless the parties stipulate otherwise.... A stipulation for a post-judgment allocation and award by the trial court would normally be preferable since that determination would be made after completion of the legal services ... and proof ... could be simplified because of the court's expertise in evaluating legal services.

*Id.* at 819–20, 210 Cal.Rptr. 211, 693 P.2d 796 (citations omitted).

Here, the parties have stipulated that the Court determine post-judgment fees.

### 2. *Analysis*

#### a. *Fees in the Present Action*

██ U.S. Hotels' counsel Brian Strange has submitted a declaration stating, and has attached itemized billing statements showing, that the total legal bills in this case for time and costs through February 24, 1993 is $332,-472.19. Strange Declaration, Mar. 1, 1993, at 2. As for allocation, plaintiffs propose that an award of two-thirds is fair and avoids the difficult task of dividing fees. Certainly, plaintiffs assert, the portion of trial for extra-contractual damages was no more than one-third given that U.S. Hotels had to prove a breach of contract before requesting extra-contractual damages. Thus, the total request for fees in this action is $221,648.13.

Defendant objects to fees, claiming that *Brandt* provides little support for plaintiffs' arguments. First State argues that *Brandt* permits recovery of fees incurred by the insured to compel payment of *benefits due* under an insurance policy, but does not allow fees incurred in order *to prove* that an insurer breached its insurance contract. However, this argument appears to raise a distinction without a difference. Plaintiffs should not be denied *Brandt* fees on the basis that they *proved* First State breached its contractual duties.

Defendant also claims that The Pacific Group was not the victim of First State's tortious conduct. Further, First State notes that *Brandt* fees were intended to benefit an insured who retains counsel to compel benefits. *See Xebec Dev. Partners, Ltd. v. Nat'l Union Fire Ins. Co.,* 12 Cal.App. 4th 501, 571–72, 15 Cal.Rptr.2d 726 (1993) (insureds assigned all of their rights to claimant, in this context court held assignee could not seek attorneys' fees under *Brandt* ).

Moreover, defendant argues that plaintiffs have failed to prove the amount of legal fees that were "reasonably necessary to collect benefits due under the policy." *California State Automobile Ass'n, Inter–Ins. Bureau v. Superior Court,* 184 Cal.App.3d 1428, 1434, 229 Cal.Rptr. 409 (1986). That is, First State states that plaintiffs' two-thirds formula, although simple, is imprecise and no evidence has been adduced showing why the two-thirds allocation is fair.

Finally, defendant insists that if the Court elects to distribute *Brandt* fees, the proper amount is $4,462.50 because those where the only fees incurred to recover policy benefits. This figure is derived from the fact that, as of the Court's Order of July 19, 1990, plaintiffs had completed the task of proving that First State was obligated to drop down and the fees to that date indicate an amount of $4,462.50. Defendant claims that from the time of the settlement with The Pacific Group in August 1989 to the present, the U.S. Hotels were thus directed primarily toward achieving extra-contractual damages as it assigned its contract claims to The Pacific Group. However, this figure of $4,462.50 ignores First State's numerous attempts after July 1990 to convince the Court that it had no duty to defend its insureds.

██ Although the parties dispute this issue, plaintiffs tellingly acknowledge that it "does not appear that any California court has addressed the precise issue confronting this Court." U.S. Hotels' Reply in Support of Attorneys' Fees, Apr. 15, 1993, at 2. The general rule is that, unless specifically authorized, attorneys' fees are not recoverable. *See Reynolds Metals Co. v. Alperson,* 25 Cal.3d 124, 127, 158 Cal.Rptr. 1, 599 P.2d 83 (1979). As there are no cases on point per-

mitting those fees which plaintiffs seek, the Court will not expand the rule announced in *Brandt.* Rather, the Court defers to the American Rule and, therefore, DENIES plaintiffs' motion for attorneys' fees incurred in the present action.

### b. *Fees in the Underlying Action*

U.S. Hotels also requests attorneys' fees from the underlying action incurred after its tender of defense to First State. Those fees total $361,329.41. Strange Declaration, Mar. 1, 1993, at 2. Defendant does not object to this amount. *See* Defendant's Response to the Court's June 2, 1993 Order, Jun. 17, 1993, at 9. Accordingly, the Court finds this amount reasonable and GRANTS plaintiffs' motion for attorneys' fees incurred in the underlying action.

### III. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Defendant's motion for a new trial is DENIED.

2. Defendant's motion for to alter or amend the verdict or, as construed by the Court, motion for reconsideration, is DENIED.

3. Defendant's motion for judgment notwithstanding the verdict is GRANTED as to punitive damages and DENIED as to compensatory damages. The jury's punitive damages award is VACATED.

4. Plaintiffs' motion for compensatory damages and judgment is GRANTED.

5. Plaintiffs' motion for attorneys' fees is GRANTED as to the underlying action and DENIED as to the instant action.

IT IS SO ORDERED.